882 A.2d 961 (2005)
380 N.J. Super. 443
Lois MYERS, Plaintiff-Appellant,
v.
AT & T, Defendant-Respondent.
Superior Court of New Jersey, Appellate Division.
Argued March 7, 2005.
Decided September 9, 2005.
Neil H. Deutsch, Hackensack, argued the cause for appellant (Deutsch Resnick, *962 attorneys; Mr. Deutsch and Jonathan I. Nirenberg, on the brief).
David M. Wissert, Roseland, argued the cause for respondent (Lowenstein Sandler, attorneys; Mr. Wissert, of counsel and on the brief; Kristen L. Troncoso and Gina M. Sarracino, on the brief).
Before Judges A.A. RODRÍGUEZ, WEISSBARD and HOENS.
The opinion of the court was delivered by
HOENS, J.A.D.
Plaintiff Lois Myers appeals from the November 7, 2003 order of the Law Division granting summary judgment in favor of defendant AT & T and dismissing her discrimination complaint in its entirety. We reverse and remand.
This appeal raises novel issues concerning the meaning and interpretation of recent United States Supreme Court guidance in mixed motive discrimination cases, see Desert Palace, Inc. v. Costa, 539 U.S. 90, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003), and concerning the appropriate application of the traditional burden-shifting analysis, see McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), in the context of motions for summary judgment in discrimination cases. The importance of these issues requires that we address the facts and the motion judge's analysis at some length.
Plaintiff began working for defendant in 1983. In February 1998, she was diagnosed with ovarian cancer and was on paid leave from her job as a global marketing staff manager until November 1998. At that point, she returned to her previous position, having been advised that her cancer was in full remission. In the summer of 1999, she was a B-band manager in defendant's Consumer Services High Value Clients Organization (the Organization), working in Morristown. There were two other B-band managers in the Organization, Greg Kirby and Marissa Cozzolino.
Although plaintiff and Kirby were both B-band managers within the Organization, they were not performing identical job assignments. Plaintiff was responsible for "marketing strategy, marketing tactics, interfacing with the marketing communications team to develop the direct marketing plan," working with the sales support group and working with the market research group to ensure that defendant was addressing the needs of its high-value customers. The focus of her job was marketing communications and, more specifically, working with groups outside the Organization to develop direct mail pieces. Kirby's job entailed tracking and reporting customer usage. Kirby testified that his job involved working with the "CIO group" to assemble customer lists so that high-value customers could be targeted with marketing materials.
In November or December 1999, plaintiff asked for a salary review. In response to that request, Gary Hilbert, the Director and Vice President of the Organization, consulted with human resources personnel. After that consultation, Hilbert told plaintiff that salary reviews were conducted during annual performance reviews, with actual adjustments to salary taking effect during the following March. As a result, plaintiff agreed to wait until her performance review was completed and to address her salary request in that forum.
As a part of the appraisal process, each employee was required to complete a self-evaluation. The performance appraisal policy in place at the time called for the evaluation of employees in accordance with their business attainment and their demonstration of leadership skills. As to the former, the employees were rated *963 against a scale ranging from "significantly below target" to "below target" to "on target" to "above target." The last of these, "above target," was the highest ranking possible for business attainment. With respect to leadership skills, the scale ranged from "needs development" to "skilled" to "accomplished" to "role model." Again, the last of these was the highest possible ranking for leadership skills. Each combination of the rankings for business attainment and leadership competency was given a code to identify it. The highest combined ranking, namely "role model" and "above target," was identified by the 1R code.
In December 1999, the Organization conducted its performance appraisals for that year. Plaintiff completed her self-appraisal and gave herself the highest combined ranking by checking off the appropriate boxes on the appraisal form and by including narrative comments to support her self-evaluation. Her fellow B-band manager, Greg Kirby, also rated himself with the highest combined ranking.
In general, the performance appraisal process would continue after the self-appraisals had been completed. Each employee would submit the completed form to his or her direct supervisor and the self-appraisals would be utilized in a round table meeting during which the appraisal process would be completed. The round table meeting included each of the relevant supervisors and a group leader. Each of these individuals would provide his or her own input into the appraisal based on individual interactions with each employee and an evaluation of each employee's work product. In general, after the members of the round table reached a consensus, the final performance appraisal was submitted for the approval of the group leader.
In 1999 and 2000, overall performance ratings were also subject to the forced ratings distribution directive. This directive placed a limit on the percentage or number of employees who could receive the highest ranking within any group. Plaintiff was aware that her appraisal could be changed during the evaluation process from the one that she had submitted. It was not uncommon for the performance appraisals to be changed in the group discussion at the round table from the self-evaluations submitted by the employees. This was particularly true because the forced ratings distribution directive limited the number of top-ranked ratings that could be awarded.
The participants at the 1999 round table meeting for supervisors of the B-band managers were Hilbert, Dana Joachim, who was the direct supervisor for both plaintiff and Kirby, and Steve Pardonner, who was Cozzolino's direct supervisor. Joachim and Pardonner were C-band and D-band managers, respectively, each of which is a higher level of manager than the B-band managers. Hilbert was the head of the Organization and the supervisor for both Joachim and Pardonner.
At the time of the 1999 round table meeting, there were rumors about the possibility that there would be cutbacks or layoffs in the Organization. Plaintiff asserts that Hilbert knew that a reduction in force (RIF)[1] was coming and that the 1999 performance appraisals were going to be used as a part of that process. Hilbert, whose testimony is inconsistent in this aspect, testified that he knew that the RIF was coming and that the appraisals would *964 be used in that context. In addition, however, he admitted that he was also aware that the entire Organization was going to be eliminated during the RIF. Notwithstanding those admissions, he asserted that he only knew that one or more of the B-band managers might be losing his or her job and that the appraisals might be used for that purpose.
Joachim, on the other hand, was unequivocal in her admission that the participants in the round table in 1999 knew that the reduction in personnel would occur and that some employees of the group that included the Organization would be terminated. Although she was not aware of the details of the planned cuts in the workforce, she knew that the reduction was coming. The other participant in the round table, Pardonner, denied knowing about a planned RIF until February 2000. He, too, however, conceded that he had heard the rumors in advance of the 1999 round table.
During the round table meeting, the participants discussed plaintiff's performance. Hilbert, who had had only infrequent contact with plaintiff, relied heavily on Joachim for her input as plaintiff's direct supervisor. Eventually, the group, relying on Joachim, concluded that they disagreed with plaintiff's self-appraisal. They determined that her business attainment was "on target," rather than "above target," and that she was "accomplished," rather than a "role model," in her demonstration of leadership competencies. As a result of these discussions, Joachim used "white-out" to change the rankings on the self-appraisal that had been submitted by plaintiff and retraced the edges of the boxes that had been obliterated in the process. Plaintiff asserts that this was done in order to make it appear that she had signed and approved of the rankings reflected on the altered form when in fact the revised form was never shown to her prior to her termination. Defendant asserts, on the contrary, that it was not unusual for supervisors to change the forms in this fashion and that there was no improper purpose in doing so. After the form was changed to reflect the consensus of the round table members, Hilbert signed it, but, contrary to the group's usual practice, Joachim did not.
Ordinarily, the finalized appraisal would be given to and reviewed with the employee who would then have the opportunity to sign it. Joachim did not, however, give this finalized appraisal to plaintiff and did not ask her to sign it. According to Joachim, she advised plaintiff of the downgraded appraisal orally. Plaintiff disputes that assertion, claiming that she was unaware of the changed appraisal until after she was terminated and had instituted this litigation. Regardless of when plaintiff received the altered appraisal, she apparently became aware of the lowered rating during the termination process.
As a result of the round table discussions, both plaintiff and Cozzolino were ranked as "on target" and "accomplished," while Kirby was rated as "above target" and a "role model," the highest possible combined ranking. According to Joachim's testimony, she believed that both plaintiff and Kirby were good performers with equal knowledge and experience in their different work areas. She rated plaintiff lower in the performance appraisal, however, because she believed that Kirby worked harder and worked longer hours than did plaintiff and because she thought that he was more productive than plaintiff. In particular, she described Kirby by saying that he worked "a little bit harder," that his hours were "longer" and that his production level was "slightly better."
*965 Central to plaintiff's claim, however, is Joachim's concession that she believed that plaintiff was not working as hard as Kirby because of plaintiff's cancer. In relevant part, Joachim testified: "My perception was that [plaintiff] may have been working harder if she hadn't had the illness."
On February 1, 2000, defendant issued a letter to plaintiff advising her that she was at risk of termination as a part of the RIF. That letter further advised her that she was within the definition of an at risk employee based on her 1999 performance rating. She was given sixty days to find another position with defendant, failing which she would be terminated. At first, it appeared that there might be positions for two B-band managers in another division and that plaintiff would be one of the two chosen to transfer to that division, but eventually there was only one such opening.
Although there is a dispute about how the decision concerning who should be retained was made, Hilbert was central to the process. He may have had assistance in reaching the decision from both Joachim and Kim Partoll, the head of the department with the opening. Timothy Ward, the designated representative of defendant's Human Resources department, testified that there were a variety of options available to be used in making the choice. Ward stated that Hilbert opted to use only the 1999 performance appraisals as the basis for deciding because Hilbert believed that this would be the most accurate measure of each employee's contributions to the company. Hilbert disputed this and asserted that he was required to use only the 1999 performance appraisals in making the choice about which employee would be retained. In either event, Kirby, who had the higher 1999 performance appraisal ranking, was selected for the opening in the other division.
At about the same time, when it became clear that there was only one opening available, Joachim advised plaintiff that she had not been chosen. Plaintiff asserts that, several times during the course of telling her that Kirby had been selected and that she had not, Joachim advised plaintiff to hire a lawyer, leading plaintiff to believe that she had been discriminated against and that Joachim knew it. Joachim did not deny making such a statement, but could not affirmatively recall whether she actually did so. Plaintiff applied for several other positions with defendant but her efforts were unsuccessful and she was terminated effective March 31, 2000.
Plaintiff filed her complaint in the Law Division in June 2001. She asserted that defendant had discriminated against her based on her disability due to her cancer, perceived disability, gender and age. She also asserted that while she was employed by defendant, she was discriminated against in her compensation based on her gender. After the completion of discovery, defendant moved for summary judgment on all of the counts in the complaint. The motion judge issued his written decision granting defendant's motion as to all counts of the complaint on November 7, 2003 and he therefore dismissed the complaint in its entirety. On appeal, plaintiff challenges only the dismissal of her disability and perceived disability counts.
In addressing these counts, the motion judge analyzed the complaint both in the context of traditional pretext, or McDonnell Douglas principles, and in accordance with a mixed motive analysis. Because the appropriate analysis of these theories differs, we address them separately.
We start with the observation that the motion judge's articulation of the McDonnell Douglas or pretext test for discrimination was entirely correct. As he recognized, *966 all motions for summary judgment, including those arising in the context of discrimination cases, are judged in accordance with the standards set forth in Rule 4:46-2 and our Supreme Court's directives in Brill v. Guardian Life Insurance Co. of America, 142 N.J. 520, 540, 666 A.2d 146 (1995). We review such decisions by applying the same standard as the one utilized at the trial court level. Ibid. With that standard in mind, we turn to the issues raised in this appeal.
The New Jersey Law Against Discrimination (LAD), among other things, prohibits employers from discriminating against employees based upon disability or perceived disability. N.J.S.A. 10:5-4.1; N.J.A.C. 13:13-1.3; Andersen v. Exxon Co. U.S.A., 89 N.J. 483, 491-92, 446 A.2d 486 (1982); Rogers v. Campbell Foundry, Co., 185 N.J.Super. 109, 112-13, 447 A.2d 589 (App.Div.), certif. denied, 91 N.J. 529, 453 A.2d 852 (1982).
In analyzing discrimination claims, we have generally followed the approach utilized by the federal courts in civil rights cases involving Title VII[2] complaints. See Grigoletti v. Ortho Pharm. Corp., 118 N.J. 89, 97-98, 570 A.2d 903 (1990); Peper v. Princeton Univ. Bd. of Trs., 77 N.J. 55, 83, 389 A.2d 465 (1978). As our Supreme Court has noted, this analytical framework has been "most cogently presented," see Grigoletti, supra, 118 N.J. at 97, 570 A.2d 903, in the United States Supreme Court's seminal decision in McDonnell Douglas. The familiar elements of that analytical framework, often referred to as the burden-shifting or pretext analysis, are: (1) proof by plaintiff of the prima facie elements of discrimination; (2) production by the employer of a legitimate, non-discriminatory reason for the adverse employment action; and (3) demonstration by plaintiff that the reason so articulated is not the true reason for the adverse employment action, but is instead a pretext for discrimination. McDonnell Douglas, supra, 411 U.S. at 802, 93 S.Ct. at 1824, 36 L.Ed.2d at 677; see Mogull v. CB Commercial Real Estate Group, Inc., 162 N.J. 449, 462, 744 A.2d 1186 (2000); Erickson v. Marsh & McLennan Co., 117 N.J. 539, 549-51, 569 A.2d 793 (1990).
Our Supreme Court has noted that the McDonnell Douglas framework has been formulated in order to compensate for the fact that direct evidence of discrimination is often not found. See Bergen Commercial Bank v. Sisler, 157 N.J. 188, 209-10, 723 A.2d 944 (1999). It is therefore the principal method for proving discrimination claims in general. See Greenberg v. Camden County Vocational & Technical Sch., 310 N.J.Super. 189, 198, 708 A.2d 460 (App.Div.1998); Parker v. Dornbierer, 140 N.J.Super. 185, 189, 356 A.2d 1 (App.Div.1976).
The parties do not dispute that plaintiff met the burden imposed upon her to demonstrate the elements of her prima facie case. Indeed, our Supreme Court has recently held:
The evidentiary burden at the prima facie stage is "rather modest: it is to demonstrate to the court that plaintiff's factual scenario is compatible with discriminatory intent  i.e., that discrimination could be a reason for the employer's action." Marzano [v. Computer Sci. Corp., 91 F.3d 497, 508 (3d Cir.1996)]; see also Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207, 215 (1981)(describing burden of establishing a prima facie case as "not onerous"); Torre v. Casio, Inc., 42 F.3d 825, 829 (3d Cir.1994) (describing prima facie case as *967 "relatively simple")(quoting McKenna v. Pac. Rail Serv., 32 F.3d 820, 825 (3d Cir.1994)); Massarsky v. Gen. Motors Corp., 706 F.2d 111, 118 (3d Cir.)(describing prima facie case as "easily made out"), cert. denied, 464 U.S. 937, 104 S.Ct. 348, 78 L.Ed.2d 314 (1983)); Peper [, supra, 77 N.J. at 81], 389 A.2d 465, 478 ... (writing "the standard for presenting a [p]rima facie case cannot be too great lest rampant discrimination go unchecked.").
[Zive v. Stanley Roberts, Inc., 182 N.J. 436, 447-48, 867 A.2d 1133 (2005).]
Nor do the parties seriously dispute that defendant's expressed reason for its decision to retain Kirby and to terminate plaintiff, would, if believed, be a legitimate and nondiscriminatory one.
Rather, the focus of this aspect of the appeal is the sufficiency of the proofs plaintiff offered to demonstrate that the reason given by the employer for its choice was merely pretextual. In this regard, plaintiff asserts that the 1999 performance appraisal was itself discriminatory. She points out that her appraisal was downgraded because of Joachim's perception that plaintiff was not working quite as hard as Kirby. She further notes that Joachim admitted that this belief was based on the fact that plaintiff had cancer or had been treated for cancer. Therefore, plaintiff asserts that her supervisor's decision to downgrade her performance appraisal in comparison to Kirby's was based on a prohibited discriminatory reason, that it was undertaken at a time when the participants in the round table knew that a RIF was imminent and that the appraisal was then used as the sole basis for retaining Kirby rather than plaintiff when other means of selection were equally available.
It is largely undisputed that the 1999 performance appraisal was the basis for the decision about which employee would be transferred to the only position available after the RIF. In fact, the only actual dispute about the use of the appraisal is whether company policy mandated that the appraisal be the sole criterion or whether other selection methods were equally available to Hilbert. Therefore, if plaintiff can establish at trial that the 1999 performance appraisal itself was based on discrimination, she may be entitled to recover under the LAD. See, e.g., Josey v. John R. Hollingsworth Corp., 996 F.2d 632, 639-40 (3d Cir.1993)(employer's need to reduce workforce does not absolve it from examination of its motives in dismissing particular employee); Hargrave v. County of Atl., 262 F.Supp.2d 393, 426-28 (D.N.J.2003)(discriminatory evaluation alone is insufficient to establish adverse employment action; to be actionable, discriminatory evaluation must be shown to have had an effect on the terms and conditions of employment).
In addressing plaintiff's pretext claim, the motion judge believed that plaintiff was asserting that the RIF itself was discriminatory. We, however, do not understand that to be plaintiff's claim at all. In fact, plaintiff does not attack, nor on this record could she, the bona fides of the overall program to reduce defendant's workforce. Rather, she asserts that in that context the employer was required to make its choices about who to retain and who to terminate in a non-discriminatory manner and that it failed to do so. Certainly, were the judge's analysis of the gravamen of the claim correct, the result he reached would perhaps follow logically. Because we conclude that he misperceived the focus of the pretext argument, however, the result he reached was, necessarily, mistaken.
Moreover, we differ with the motion judge's evaluation of the evidence that *968 plaintiff relies on as support for her pretext argument. We note that the issue arose in the context of a motion for summary judgment. Therefore, in analyzing the evidence plaintiff offered to demonstrate pretext, the court was obligated to give plaintiff the benefit of all of the favorable inferences supported by that evidence. See Brill, supra, 142 N.J. at 523, 666 A.2d 146. Viewed most favorably to plaintiff, the performance appraisal was based on Joachim's belief that plaintiff was working slightly less hard and was not quite as productive as Kirby because of her cancer. Moreover, if plaintiff is to be believed, Joachim altered the appraisal, which was permitted, but then attempted to conceal that alteration both by redrawing the original boxes on the form previously signed by plaintiff and by not thereafter giving it to plaintiff for her review and not telling plaintiff that her appraisal had been downgraded.
For purposes of the motion for summary judgment, it is irrelevant whether plaintiff found out about the downgrade during the course of the RIF or during the discovery that was exchanged as a part of the litigation. The simple fact is that even taking the employer's version of events as true, by the time that plaintiff learned of the downgrade, the RIF was in progress, she was at risk for termination, and it was too late for her to address the allegedly discriminatory act that became the ground for her termination.
We differ with the motion judge's evaluation of the record relating to Joachim's perception for a further reason. He discounted Joachim's concession about the basis for her decision to downgrade plaintiff's performance assessment, noting that she gave this response during her deposition in answer to a question that defendant characterizes as leading. We discern no legitimate ground for this view. While the deposition transcript on which plaintiff relies includes many questions that could be described as leading, those questions were permissible given that Joachim was, in essence, being cross-examined. See N.J.R.E. 611(c). More to the point, however, the critical concession for purposes of showing that Joachim's evaluation of plaintiff's performance was based on the fact that plaintiff had cancer was Joachim's own statement to that effect rather than a mere assent to words used by plaintiff's attorney. See State v. Abbott, 36 N.J. 63, 78-79, 174 A.2d 881 (1961)("ordinarily a question is not improperly leading unless it suggests what the answer should be or contains facts which in the circumstances can and should originate with the witness"). In particular in the context of pretext claims, plaintiff was free to rely as a part of her proofs on Joachim's rather candid response to the question about the basis for her decision. Our review of the record persuades us that the statement attributed to Joachim should have been accepted as true for the purpose of addressing the summary judgment motion within the McDonnell Douglas framework.
In the alternative, plaintiff asserted that she was proceeding under the so-called mixed motive theory of discrimination. In evaluating this aspect of the complaint, the motion judge found that plaintiff's mixed motive claim failed to present direct evidence of discrimination and thus could not survive. He reached this conclusion by relying on the seminal decision of the United States Supreme Court in Price Waterhouse v. Hopkins, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989). In doing so, he distinguished more recent guidance from that Court, see Desert Palace, supra, finding it to be irrelevant. We disagree with this analysis and conclusion.
The Price Waterhouse decision arose in the context of Title VII litigation. Historically, *969 Title VII of the Civil Rights Act has given rise to two lines of authority, which rest upon two different types of proof. The first, requiring only circumstantial evidence of discrimination, is embodied in the burden-shifting framework established in the McDonnell Douglas decision. In Price Waterhouse, however, the United States Supreme Court adopted the mixed motive analysis for use as an alternative in Title VII cases. 490 U.S. at 252, 109 S.Ct. at 1791-92, 104 L.Ed.2d at 289. Recognizing that many employment decisions have more than one ground and recognizing that often a challenged decision may be based on more than one reason, only one of which may be discriminatory, the Court determined that a different standard than the one expressed in McDonnell Douglas would be applicable in cases involving mixed motives. Ibid. In such a case, if a plaintiff could demonstrate that an impermissible or discriminatory reason was a motivating factor for the adverse employment decision, the burden would shift to the employer to prove that it would have made the same decision even without the unlawful motive. Id. at 244-45, 109 S.Ct. at 1787-88, 104 L.Ed.2d at 284-85.
The Court, however, was not unanimous in its articulation of the predicate required for reliance on the mixed motive test. In particular, Justice O'Connor, in her concurring opinion, wrote that only a plaintiff who "demonstrated by direct evidence that an illegitimate factor played a substantial role" in the adverse employment decision would be entitled to the benefit of the burden shift in a mixed motive case. Id. at 275, 109 S.Ct. at 1803, 104 L.Ed.2d at 304 (O'Connor, J., concurring). This articulation, that is, that the mixed motive analysis is only available if the plaintiff produces "direct evidence" of the discriminatory ground for an employment decision, is recognized as the holding of Price Waterhouse because Justice O'Connor's concurring vote created the requisite majority of the Court.
After the decision in Price Waterhouse, Congress amended Title VII to redefine the standard of proof applicable to cases brought pursuant to that part of the Civil Rights Act. See 42 U.S.C.A. § 2000e-2(m). The language of the amended Act does not refer to direct evidence, but permits reliance on the mixed motive analysis if the plaintiff can demonstrate that a discriminatory reason was "a motivating factor ... even though other factors also motivated the practice." Ibid. Following the amendment of Title VII, however, courts continued to interpret the Act in accordance with Justice O'Connor's direct evidence articulation, therefore requiring plaintiffs in mixed motive cases to adduce proof of a discriminatory intent directly, namely through an admission or other similarly unmistakable proof. See, e.g., Watson v. S.E. Pa. Transp. Auth., 207 F.3d 207, 215-16 (3d Cir.2000), cert. denied, 531 U.S. 1147, 121 S.Ct. 1086, 148 L.Ed.2d 961 (2001). Our own Supreme Court, see Fleming v. Corr. Healthcare Solutions, Inc., 164 N.J. 90, 100-01, 751 A.2d 1035 (2000), and this court, see Donofry v. Autotote Sys., Inc., 350 N.J.Super. 276, 290, 795 A.2d 260 (App.Div.2001), also followed this interpretation of the mixed motive theory and of its required factual predicate.
In Desert Palace, the United States Supreme Court, in a unanimous opinion authored by Justice Thomas, concluded that proof of mixed motive in a Title VII case need not rest on direct evidence of discrimination. 539 U.S. at 99-100, 123 S.Ct. at 2154, 156 L.Ed.2d at 94-95. Relying on the amended language of the Act, the Supreme Court concluded that Title VII no longer requires a heightened standard of proof and that circumstantial evidence is equally probative of discriminatory intent as is direct proof. The Court held that the *970 contrary requirement of Price Waterhouse no longer applies to Title VII mixed motive claims. Ibid.
The Court did not specifically overrule Price Waterhouse, but noted that Congress, in amending Title VII after that decision, adopted a different test than had the Court. Id. at 98, 123 S.Ct. at 2153, 156 L.Ed.2d at 93-94. The Court analyzed the language of the amended Act and relied on several opinions respecting the "utility of circumstantial evidence in discrimination cases." Id. at 100, 123 S.Ct. at 2154, 156 L.Ed.2d at 94. In particular the Court noted: "the reason for treating circumstantial and direct evidence alike is both clear and deep-rooted: `Circumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence.'" Ibid. (quoting Rogers v. Mo. Pac. R.R. Co., 352 U.S. 500, 508 n. 17, 77 S.Ct. 443, 449 n. 17, 1 L.Ed.2d 493, 500 n. 17 (1957)).
Since Desert Palace was decided, the federal courts have split when confronted with the question of whether the effect of that ruling is limited to Title VII complaints or whether it is to be applied more broadly to all mixed motive discrimination cases. In Griffith v. City of Des Moines, 387 F.3d 733 (8th Cir.2004), for example, the Eighth Circuit found that the reference to direct evidence in Price Waterhouse referred to the strength of the proofs rather than to a distinction between evidence of that quality and circumstantial evidence. Id. at 736. That court, as a result, concluded that the Desert Palace decision had "no impact" on earlier Eighth Circuit decisions. Ibid. In Hill v. Lockheed Martin Logistics Management, Inc., 354 F.3d 277 (4th Cir.2004)(en banc), cert. dismissed, ___ U.S. ___, 125 S.Ct. 1115, 160 L.Ed.2d 1090 (2005), the Fourth Circuit assumed, without deciding directly, that the Desert Palace decision applied only to mixed motive cases brought pursuant to Title VII, declining to apply that analysis to a claim filed pursuant to the ADEA. Id. at 285.
In Rachid v. Jack in the Box, Inc., 376 F.3d 305 (5th Cir.2004), the Fifth Circuit concluded that the statutory language of the ADEA itself made clear that the heightened direct evidence standard did not apply and declined to reach the question of whether Desert Palace also compelled that result. Id. at 311 & n. 8 (citing Estades-Negroni v. Assocs. Corp. of N. Am., 345 F.3d 25, 31 (1st Cir.2003))(other citations omitted). In Keelan v. Majesco Software, Inc., 407 F.3d 332 (5th Cir.2005), a different panel of the Fifth Circuit commented that it was error for the plaintiff there to assert "that Desert Palace changed McDonnell Douglas" and concluded that in disparate treatment cases, the latter test still controls. Id. at 341. One federal district court has concluded that, in light of Desert Palace, in all discrimination claims the third element of the McDonnell Douglas test, namely, the pretext prong, has essentially "disappear[ed]," leading to a series of separate considerations depending upon whether the employer's proffered reason for the employment action is true or false. See Dunbar v. Pepsi-Cola Gen. Bottlers of Iowa, Inc., 285 F.Supp.2d 1180, 1196-97 (N.D.Iowa 2003).
As these examples demonstrate, there is no consensus among the federal courts respecting the scope of the Desert Palace decision. The Third Circuit has not directly addressed the issue. Monaco v. Am. Gen. Assurance Co., 359 F.3d 296, 300 n. 5 (3d Cir.), cert. denied, ___ U.S. ___, 125 S.Ct. 62, 160 L.Ed.2d 19 (2004); see Bequeath v. L.B. Foster Co., 367 F.Supp.2d 779, 786 n. 4 (W.D.Pa.2005). Nor is there guidance from our own Supreme Court concerning how the decision in Desert Palace *971 might alter its analysis of the Price Waterhouse formulation, requiring direct evidence of discrimination in all mixed motive cases, which it has followed.
Here, the motion judge rejected the suggestion that the Desert Palace decision had any effect on the test to be applied in mixed motive cases. He first concluded that the decision could be read no more broadly than the language of Title VII itself. He reasoned that this plaintiff was not proceeding under Title VII at all, and that while our courts have traditionally looked generally to Title VII cases for guidance, it would be inappropriate to do so here by relying on Desert Palace because the test for discrimination under our LAD is different from the Title VII test. He further commented that neither party had presented him with binding precedent concerning the use of mixed motive and direct evidence in LAD cases.
In particular, he considered and rejected as irrelevant two mixed motive decisions from our Supreme Court because they arose from different statutory discriminatory claims. See McDevitt v. Bill Good Builders, Inc., 175 N.J. 519, 522-23, 816 A.2d 164 (2003)(asserting age discrimination claim, Age Discrimination in Employment Act, 29 U.S.C.A. § 623a(1)); Fleming, supra, 164 N.J. at 93, 751 A.2d 1035 (asserting whistleblower claim, Conscientious Employee Protection Act (CEPA), N.J.S.A. 34:19-1 to -8). He therefore concluded that those decisions had no bearing on plaintiff's claim. We disagree with this analysis.
In McDevitt, our Supreme Court adopted the mixed motive framework as an alternative method of proof of age discrimination. 175 N.J. at 523, 816 A.2d 164. In Fleming, while ultimately concluding that plaintiff's proofs fell short of the standard required for the mixed motive analysis, the Court nevertheless considered that alternative to be an appropriate one in a CEPA case. 164 N.J. at 100-01, 751 A.2d 1035. In each, as well, the Court found it appropriate to utilize the Price Waterhouse standard for mixed motive cases. Therefore, our Supreme Court has interpreted mixed motive and its direct evidence requirement to be broadly applicable regardless of the statutory context. As a result, in spite of the fact that Price Waterhouse was a Title VII case, its analytical framework has not been confined to claims brought under that Act alone, but has been given wider application. That being the case, the logical conclusion is that the revised articulation of the mixed motive analysis found in Desert Palace ought not be limited to Title VII cases alone. We reach this conclusion because, while the decision in Desert Palace rests in part on the amendment to Title VII enacted in the wake of Price Waterhouse, the Court's more general language concerning the reliability of circumstantial proofs bespeaks a recognition that the direct evidence requirement may no longer be viable in any mixed motive analysis.
However, even if we were to conclude that the Desert Palace decision is limited to Title VII cases and that direct evidence of discriminatory animus is required for the mixed motive analysis, there is sufficient direct evidence of defendant's discriminatory intent in this record to make summary judgment inappropriate. When compared to the evidence considered in decisions of our Supreme Court in mixed motive cases, the statements made by Joachim suffice to withstand summary judgment. Although our Supreme Court has not had the occasion to comment on the scope it would assign to the Desert Palace ruling, particularly instructive for purposes of understanding the Court's analysis of direct evidence is the Court's recent decision in McDevitt, supra. In *972 analyzing the Price Waterhouse requirement there, the Court found that a supervisor's head nod was sufficient direct evidence to defeat a motion for summary judgment in a mixed motive case. See McDevitt, supra, 175 N.J. at 531, 816 A.2d 164. In doing so, the Court utilized the Third Circuit's approach in determining whether sufficient direct evidence had been adduced. Writing for the Court, Justice LaVecchia described that analysis: "[A] court must consider whether a statement made by a decisionmaker associated with the decision-making process actually bore on the employment decision at issue and communicated the proscribed animus." Id. at 528, 816 A.2d 164 (citing Fakete v. Aetna, Inc., 308 F.3d 335, 339 (3d Cir.2002)). The Court then discussed the qualitative nature of the proofs as they related to direct evidence. Id. at 529-32, 816 A.2d 164.
Similarly, in Fleming, the Court quoted the applicable test for direct evidence as follows: "At a bare minimum, a plaintiff seeking to advance a mixed-motive case will have to adduce circumstantial evidence `of conduct or statements by persons involved in the decisionmaking process that may be viewed as directly reflecting the alleged discriminatory attitude.'" Fleming, supra, 164 N.J. at 101, 751 A.2d 1035 (quoting Jackson v. Georgia-Pac. Corp., 296 N.J.Super. 1, 18-19, 685 A.2d 1329 (1996), certif. denied, 149 N.J. 141, 693 A.2d 110 (1997)(citing Griffiths v. CIGNA Corp., 988 F.2d 457, 470 (3d Cir.), cert. denied, 510 U.S. 865, 114 S.Ct. 186, 126 L.Ed.2d 145 (1993), overruled on other grounds, Miller v. CIGNA Corp., 47 F.3d 586 (3d Cir.1995)(in banc) (citation omitted))).
Here, we need not address the thorny issue of whether the head nod qualified as an adoptive admission that confronted the court in McDevitt, supra, 175 N.J. at 529, 816 A.2d 164. Plainly, the Court's analysis in McDevitt and in Fleming dictates that we follow an interpretation of the direct evidence requirement different from the one utilized by the motion judge. This plaintiff has presented proof, through Joachim's statement in her deposition, that Joachim's belief about the comparative performance of the two employees was based in part on the fact that plaintiff had been treated for cancer. She has presented proof that it was Joachim who was instrumental in the decision to downgrade her performance appraisal, that the members of the round table group were aware of the upcoming RIF and of the significance of the appraisals, and that ultimately while other selection criteria could have been used, the appraisal was the sole basis for her termination and Kirby's retention. We conclude that the evidence is sufficient to comply with the mixed motive analysis regardless of whether we apply the standard as articulated in Desert Palace or stricter standard of proof required under the more traditional Price Waterhouse formulation.
Reversed and remanded.
NOTES
[1] Defendant refers to the reduction in force by another term, calling it a Force Management Program, or FMP. Although the parties have utilized this terminology in their briefs, we have elected to use instead the more common term to refer to the reduction in personnel.
[2] Civil Rights Act of 1964, 42 U.S.C.A. § 2000e-2.