**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0272-23

COLLEEN SCHEUER,

    Plaintiff-Appellant,

v.

RMTS, LLC, and
CARMINE FRANCA,
Individually,

    Defendants-Respondents.

_____

Argued December 17, 2024 – Decided January 21, 2025

Before Judges Firko and Augostini.

On appeal from the Superior Court of New Jersey, Law Division, Hudson County, Docket No. L-4383-21.

Kristen Ragon argued the cause for appellant (Goldman Davis Krumholz & Dillon PC, attorneys; Evan L. Goldman and Kristen Ragon, on the briefs).

Kevin P. Gildea (DarrowEverett LLP) argued the cause for respondent RMTS, LLC (Kevin P. Gildea and Andrew J. Adams (DarrowEverett LLP), of the Massachusetts bar, admitted pro hac vice, attorneys; Kevin P. Gildea and Andrew J. Adams, on the brief).

PER CURIAM

In this retaliation and employment discrimination case, plaintiff Colleen Scheuer appeals from an August 14, 2023 Law Division order granting defendants RMTS, LLC (RMTS)'s and Carmine Franca's motion for summary judgment.[1] The court awarded defendants summary judgment on plaintiff's Pierce[2] claim (count one of the amended complaint); New Jersey Law Against Discrimination (NJLAD), N.J.S.A. 10:5-1 to -50 claim based on her actual or perceived disability and anxiety (count two); respondeat superior claim (count three); and doctrine of apparent authority claim (count four). Having considered plaintiff's arguments in light of the record and controlling legal principles, we affirm.

I.

We conduct a de novo review of an order granting a summary judgment motion, Gilbert v. Stewart, 247 N.J. 421, 442 (2021), and we apply "the same standard as the trial court," State v. Perini Corp., 221 N.J. 412, 425 (2015). In considering a summary judgment motion, "both trial and appellate courts must

---

[1] Plaintiff's claims against Franca were dismissed with prejudice and are not challenged on this appeal.

[2] Pierce v. Ortho Pharm. Corp., 84 N.J. 58 (1980).

2                                                                        A-0272-23

view the facts in the light most favorable to the non-moving party," which in this case is plaintiff. Bauer v. Nesbitt, 198 N.J. 601, 604 n.1 (2009). Summary judgment is proper if the record demonstrates "no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment . . . as a matter of law." Burnett v. Gloucester Cnty. Bd. of Chosen Freeholders, 409 N.J. Super. 219, 228 (App. Div. 2009) (quoting R. 4:46-2(c)). Issues of law are subject to the de novo standard of review, and the trial court's determination of legal issues is accorded no deference. Meade v. Township of Livingston, 249 N.J. 310, 326-27 (2021); Kaye v. Rosefielde, 223 N.J. 218, 229 (2015).

Our review of an order granting summary judgment requires our consideration of "the competent evidential materials submitted by the parties to identify whether there are genuine issues of material fact and, if not, whether the moving party is entitled to summary judgment as a matter of law." Bhagat v. Bhagat, 217 N.J. 22, 38 (2014). Here, we discern the following facts from our review of the parties' Rule 4:46-2 statements and the record of the proceedings before the court.

### A. Plaintiff's Employment with RMTS

In August 2018, plaintiff became employed by RMTS, a managing general underwriter providing stop loss underwriting services in the health insurance

3

industry, as a claims analyst.  Plaintiff reported to Jennifer Iannotti, RMTS's Senior Vice President of Contracts, and Ronald Geck, Senior Vice President of Claims.  According to plaintiff, she was a good employee and never received any written warnings.  Plaintiff resided in Jersey City for the majority of her employment with RMTS, approximately a thirty-five-minute walk to the office, and later moved to New York City.  While living in Jersey City, plaintiff occasionally walked to RMTS's office.

On January 30, 2020, the World Health Organization (WHO) declared COVID-19 a "public health emergency of international concern."  On February 3, 2020, Governor Philip Murphy, by Executive Order (EO) 102, described the symptoms associated with COVID-19 and created a task force.  The Centers for Disease Control and Prevention (CDC) issued interim guidance for businesses to plan and respond to COVID-19.  On March 9, 2020, Governor Murphy, through EO 103, declared a state of emergency and public health emergency in New Jersey.

Between January and February 2020, plaintiff first learned of COVID-19. In March 2020, there was discussion at RMTS's office about COVID-19, including the exchange of news reports.  Plaintiff was living in New York City at the beginning of the COVID-19 pandemic.

4

Plaintiff describes herself as a 5'9" tall female weighing between 250 and 350 pounds. Plaintiff claims that she was perceived as overweight by senior management. In 2018, plaintiff sustained a back injury, which required surgery, that resulted in paralysis in her right leg and foot nerve known as "drop foot." Plaintiff was evaluated by specialists for her back and weight issues. The record does not contain any medical records pertaining to an obesity diagnosis.

Sometime in 2008, plaintiff claims she was diagnosed with generalized anxiety disorder, but no medical records were submitted in support of this diagnosis. Prior to 2018, plaintiff claims she was diagnosed with high blood pressure. Her medical history is significant for flu and sinusitis. Plaintiff was treated for anxiety and grief in 2018 and 2019 after her stepfather's passing, at SoHoMD, a mental health center.

Plaintiff believed that she was in a class of people at risk of severe illness and was more susceptible to respiratory illness because of her medical history.[3] On or around March 12, 2020, plaintiff claims there was a great deal of anxiety in the workplace regarding COVID-19, and she was concerned about public health and safety in general and personally. At that time, plaintiff, Iannotti, and

---

[3] Plaintiff testified at her deposition that she formed this belief based on news reports and outlets regarding certain high-risk categories, including obesity.

A-0272-23

fellow employees Shay Woods and Candice Leger exchanged group text messages expressing concern about COVID-19 as follows:

> [I]annotti: How is it going?
>
> Woods: Okay so far, big East is cancelled, sam is worried about her trip to Europe
>
> Plaintiff: quiet
> seems like Big East is cancelled
> Sam can't go to Amsterdam
> trying to manage my own coronavirus
> anxiety
>
> . . . .
>
> Plaintiff: somebody coughed into my hair in line for the ferry
>
>  . . . .
>
> [I]annotti: Oh good. How is everything else?
>
> [W]oods: The men and Anne are going to the city for lunch
>
> With assurances they will be returning
>
> [I]annotti: well they have to[—]a majority live in NJ. I hope they are driving.
>
> Plaintiff: def they are divas
> I'm having anxiety
> may need a donut
>
> . . . .

A-0272-23

[I]annotti: Also [Franca's] instructions for the Remote Desktop, didn't include that you need to keep your computers at the office ON if you need to mirror your [desktop]. [] I told [Geck] and [Franca] but can you make sure everyone know just in case?

[L]eger: Everyone is coughing and scared (insert sad/crying emoji)
I will tell everyone

[I]annotti: In the office?
Have you all spoken to [Geck] about this?
Do you need me to?
I am happy to do so. I can make your concerns known.
I just need to know them.

Plaintiff: we are all very scared and anxious

[I]annotti: Ok. I will call him.

[W]oods: I personally am having a lot of anxiety

[I]annotti: Ok.

. . . .

[I]annotti: Can someone update if anything happens?

Woods: [Geck] told us that people on public transportation can adjust their schedules to take less busy trains

Plaintiff: We got an update with what our plan is as of right now
[Geck] said working remotely was not ideal
Concerns were brought up
The situation is fluid

A-0272-23

[W]oods: And we will likely only work from home if the city or building instructs [u]s to shut down

[I]annotti: Ok. That all seems reasonable.
Thank you for the updates.
I know they are watching the situation very closely. There isn't a map for this because it hasn't happened before. And [I] hope you know I am willing to step in and do all I can for you all. I am sorry I am not with you right now.

. . . .

[I]annotti: I am at the doctors. I will be home around 4. Can I release it then? Is [Geck] not back?

Plaintiff: haha they have been gone since you sent the email
it's not a rush
I wrote that I was "requesting reimbursement" in my email update list
the office is kind of panicked
someone in the [K]rispy [K]reme building has [COVID-19]

[I]annotti: How did you guys find that out?

. . . .

Plaintiff: it's all over [Instagram] and [Facebook]
my friend works in the building

. . . .

[I]annotti: Is everyone ok?

Plaintiff: dramatic flourish but yes

A-0272-23

[I]annotti: Ok.

Plaintiff: . . . .
Shay just switched to panic mode
everyone stocking up on Amazon
I have this dull chest pain from the anxiety I think lol

. . . .

[I]annotti: You ok?

Plaintiff: so stressed and I know a lot of it is irrational

[I]annotti: I understand. I mean all the public schools are still open in the city. That has to mean something, right?
I don't know.

Plaintiff: I think they're just slow to move
we'll take it day by day

[I]annotti: The Mayor said in his news conference that that wasn't the case but I don't trust authority of his type.
Yes. And engage in self[-]care and precautions

Plaintiff: if the cases increase like they are, I think the rational[e] to not work from home has to be more convincing

[I]annotti: I hear you.

. . . .

[I]annotti: It comes with the job. I could only ask [Geck] to get back in the office to discuss it. And he did.

9

He didn't realize that there was concern the office space.

Plaintiff: yes much better communication than when he ran out coughing lol

[I]annotti: (insert annoyed emoji).

Plaintiff: it's rising stress and anxiety.

[I]annotti: I [am] sorry. I will let you go.

Plaintiff: we will be more communicative and proactive and encourage others to do so as well.

[I]annotti: I think that it is a good idea.
Try to have a relaxing night and not think about all of this.

Plaintiff claims her communications with Iannotti were an "official request" for an accommodation to work from home during the COVID-19 pandemic, but the record shows that plaintiff never requested an accommodation for any of her conditions. The meeting mentioned in the text messages took place between plaintiff, other RMTS employees, and senior management and addressed concerns about COVID-19, public travel, processes defendants were working to implement, and defendants' decision to remain open unless ordered to close. Geck informed the employees they could adjust their schedules if they were concerned about using mass transit, but the office would remain open unless ordered to close. At 4:07 p.m., Franca emailed the employees

10

information regarding RMTS's work from home plan in case it became necessary.

On March 13, 2020, plaintiff sent an email to defendants, signed by herself and other RMTS employees, stating: "Dear Leadership, [s]ince we have the ability to efficiently work remotely, requiring us to come into the office during a pandemic unnecessarily risks our health." In response, Franca terminated plaintiff and other employees, stating, "Thank you for your email and thank you for your service at RMTS. Be safe and good luck in the future."

On March 14, 2020, plaintiff sent the following email to Iannotti and Geck:

> [Franca's] response can be read [as] a termination notice. Is that interpretation correct?
>
> For reasons he does not articulate, he seems upset that six female employees were concerned about contracting COVID-19 one hour after the President declared a [n]ational [e]mergency.
>
> My remote login which I had previously tested and worked effectively yesterday appears to have been disabled last night after [Franca] responded to us.
>
> I have no intention of abandoning my responsibilities. Requiring us to commute into the office when it is clear in the attached email stream that we can easily work remotely, is causing emotional distress and unnecessarily risking our health.

A-0272-23

Geck responded to plaintiff as follows:

> Yes, it is a termination. The company determined it is in its best interest to continue working in the office. There are contingency plans in the event the building or a government order eliminates our ability to report to the office. Your email yesterday is interpreted as an insubordinate demand that is inconsistent with the decision to continue working in our building unless and until we are told otherwise.

Plaintiff was twenty-nine years old when she was terminated.

On March 16, 2020, Governor Murphy issued EO 104, which suspended in-person Kindergarten through Grade 12 (K-12) education, operations of certain business "where large numbers of individuals gather in close proximity" and implemented social distancing measures into place. On March 19, 2020, Governor Murphy issued EOs 105 and 106, which announced changes to upcoming elections due to the COVID-19 pandemic and enacted a moratorium on removing individuals due to evictions or foreclosures.

On March 21, 2020, Governor Murphy issued EO 107, instructing individuals, except for emergency personnel, to stay-at-home. Defendants offered re-employment to the RMTS employees who signed the March 13, 2020 email within a week after termination. However, plaintiff stated that she was not offered re-employment until she retained counsel. Plaintiff thought the re-employment offer was conditioned on her apologizing for her email. Plaintiff

12

asserted she would be interested in returning to RMTS's employ but feared retaliation.

Since her termination, plaintiff has been employed as a gala coordinator. In addition, plaintiff began treatment for her body mass index, which includes weekly injections, and has been prescribed medication for depression, anxiety, and sleeplessness. Plaintiff claims she disclosed her health conditions to Iannotti.

## B. The Law Division Action

On November 11, 2021, plaintiff filed the original complaint and jury demand in the Law Division, asserting common law retaliation. Defendants moved to dismiss the complaint. Plaintiff opposed defendant's motion and cross-moved to amend the complaint. On May 13, 2022, the court denied defendants' motion to dismiss plaintiff's complaint and granted plaintiff's cross-motion to amend the complaint.

On May 18, 2022, plaintiff filed the amended complaint, which is the operative pleading in this matter. Defendants filed an answer to the amended complaint. Following a period of discovery, defendants moved for summary judgment seeking to dismiss all four counts of the amended complaint. In support of their motion, defendants contended plaintiff did not establish prima

facie claims under Pierce, the NJLAD, respondeat superior, or the doctrine of apparent authority.

In addition, defendants contended plaintiff did not establish prima facie evidence in support of her Pierce claim because there was no clear mandate of public policy in early March 2020 that all employees were entitled to work from home due to the pandemic. Defendants argued that plaintiff failed to meet her burden of identifying the existence of any clearly mandated public policy which was violated by defendants.

Defendants also argued plaintiff did not establish a prima facie case under the NJLAD based on disability because no evidence was presented that she suffered from her alleged conditions during her employment. In addition, defendants asserted there was no evidence to show defendants knew or perceived plaintiff to have any kind of disability, other than she was "heavy set," which as a matter of law is not a disability. Defendants contend plaintiff simply demanded to work from home during the pandemic and was not impeded by her weight, any disability, or other underlying health condition. According to defendants, plaintiff never requested an accommodation or any assistance due to any alleged disability or health issues.

In opposition to defendants' motion for summary judgment, plaintiff argued she identified "various sources of public policy" in support of the common law retaliation claim pursuant to Pierce. Plaintiff also contended she suffered from anxiety and obesity, both of which qualify as disabilities under the NJLAD. Plaintiff asserted that as of March 17, 2020, she had the capability to work from home and her termination was not justified.

According to plaintiff, there were genuine issues of material fact about defendants' actions in light of the pandemic and in the face of plaintiff's expressed concerns for the health and safety of herself and others. Plaintiff also argued there were genuine issues of material fact as to whether her disabilities placed her at high risk of contracting COVID-19; whether her disabilities were only situational due to the pandemic; and whether her termination was pretextual precluding summary judgment.

Following oral argument, the court granted defendants' motion and rendered an oral opinion. The court found there was no evidence in the record that plaintiff was a member of a protected class or had identified a clear mandate of public policy, which was violated by defendants. The four counts of the amended complaint were dismissed with prejudice and a memorializing order was entered. This appeal followed.

A-0272-23

On appeal, plaintiff argues the court erred in granting summary judgment to defendant. Plaintiff claims she satisfied the prima facie elements of a Pierce and NJLAD claims based on disability due to her anxiety and obesity, as it related to COVID-19. Plaintiff also argues the court failed to consider relevant facts supported by the record and the overwhelming evidence demonstrating her termination was pretextual.

## II.

Plaintiff first argues the court erred in granting summary judgment because there are clear mandates of public policy to support her Pierce claim. In particular, plaintiff contends there were public policies implemented, which were aimed at protecting the public and limiting the spread of COVID-19. RMTS contends that there were no clear public policy mandates at the time of her termination based on insubordination.

In Pierce, our Supreme Court held "that an employee has a cause of action for wrongful discharge when the discharge is contrary to a clear mandate of public policy." Pierce, 84 N.J. at 72. An employee can prove a wrongful discharge claim by "show[ing] that the retaliation is based on the employee's exercise of certain established rights, violating a clear mandate of public policy." MacDougall v. Weichert, 144 N.J. 380, 393 (1996). "The sources of public

16

policy include legislation[,] administrative rules, regulations or decisions[,] and judicial decisions." Pierce, 84 N.J. at 72.

Whether a plaintiff has established the existence of such a public policy is an issue of law. Mehlman v. Mobil Oil Corp., 153 N.J. 163, 188 (1998). "A salutary limiting principle is that the offensive activity must pose a threat of public harm, not merely private harm or harm only to the aggrieved employee." Ibid. The public policy must be "clearly identified and firmly grounded." MacDougall, 144 N.J. at 391. "A vague, controversial, unsettled, and otherwise problematic public policy does not constitute a clear mandate." Id. at 392. "Unless an employee at-will identifies a clear, specific expression of public policy, that employee may be discharged with or without cause." Hampton v. Armand Corp., 364 N.J. Super. 194, 199 (App. Div. 2003).

Plaintiff references N.J.S.A. 34:6A-3, -33, guidance on COVID-19 from the CDC, and Governor Murphy's COVID-19 EOs issued on February 3, March 9, 16, 19, and 21, 2020, in support of the clear mandates of her public policy argument. Under N.J.S.A. 34:6A-3,

> Every employer shall furnish a place of employment which shall be reasonably safe and healthful for employees. Every employer shall install, maintain and use such employee protective devices and safeguards including methods of sanitation and hygiene and where a substantial risk of physical injury is inherent in the

17

nature of a specific work operation shall also with respect to such work operation establish and enforce such work methods, as are reasonably necessary to protect the life, health and safety of employees, with due regard for the nature of the work required.

N.J.S.A. 34:6A-33(a)[4] states that every employer [p]rovide[s] each of his [or her] employees with employment and a place of employment which are free from recognized hazards which may cause serious injury, physical harm or death to his employees. Plaintiff argues that her termination was retaliatory because RMTS's actions were contrary to the Governor's COVID-19 EOs, including EOs issued after her termination.

On January 30, 2020, WHO declared COVID-19 a "public health emergency of international concern." On February 3, 2020, the Governor created a COVID-19 task force through EO 102. On March 9, 2020, the Governor declared a public health emergency and state of emergency in New Jersey in response to the COVID-19 pandemic.

On or around March 12, 2020, plaintiff claims that there was a great deal of anxiety in the workplace regarding COVID-19. That same day, there was a business meeting where employees, including plaintiff, expressed concerns

---

[4] Plaintiff incorrectly cites N.J.S.A. 34:6A-33(a) as N.J.S.A 34:5A-33(a), which relates to asbestos hazards, in her merits brief.

about mass transit during rush hour times and as a result, the employees were given permission to alter their scheduled work hours. During the meeting, no concerns were expressed about working in the office; or communication of any sort that would prevent employees from being able to report to the office, including any medical or mental disability. Franca e-mailed the employees information regarding RMTS's work from home plan in case it became necessary to allow employees to work from home.

The following day, plaintiff sent an email, signed by her and other employees, to senior management about working from home since the employees were capable of working remotely. In response, Franca terminated plaintiff and the other employees. On March 16, 2020, the Governor suspended in-person K-12 education, operations of certain businesses "where large numbers of individuals gather in close proximity," and put certain social distancing measures into place under EO 104. On March 21, 2020, the Governor issued EO 107, which ordered individuals to stay-at-home unless they were emergency personnel.

Pierce and its progeny require a public policy to be clearly identified and firmly grounded. MacDougall, 144 N.J. at 391. When viewing the facts favorable to the non-movant—here plaintiff—the undisputed facts show that she

19

has not demonstrated a clear mandate or public policy to support a <u>Pierce</u> claim. At the time of plaintiff's termination, the Governor's EOs had only created the COVID-19 task force and declared a state of emergency in New Jersey. However, the EOs did not require schools and businesses—like RMTS—to limit social distancing or require employees to work from home.

Moreover, we reject plaintiff's contention that future regulatory mandates should be considered in determining the existence of public policy. <u>Pierce</u> and its progeny do not stand for that proposition. Based upon our de novo review, we conclude that plaintiff failed to meet her burden of identifying the existence of any clearly mandated public policy, which was violated by RMTS. Therefore, plaintiff's <u>Pierce</u> claim alleged in count one of the amended complaint was properly dismissed by way of summary judgment.

### III.

Plaintiff next contends she was subject to disparate treatment based on her anxiety and obesity. She asserts that the prima facie elements of a NJLAD claim were established because her disabilities fall under the "broad standard of disability" under NJLAD. Plaintiff asserts three distinct violations under the NJLAD: (1) disability discrimination; (2) failure to accommodate; and (3) failure to engage in the interactive process.

"The [NJ]LAD's goal is 'nothing less than the eradication of the cancer of discrimination.'" Meade, 249 N.J. at 327 (quoting Raspa v. Off. of Sheriff of Gloucester, 191 N.J. 323, 335 (2007)). It is well-established that "[t]he [NJ]LAD is remedial legislation that should be liberally construed to advance its purposes." Id. at 328 (first alteration in original) (quoting Rios v. Meda Pharm., Inc., 247 N.J. 1, 10 (2021)).

But because "direct evidence of discrimination is often" difficult to find, courts apply a burden-shifting analysis to determine the viability of a discrimination claim in the absence of direct evidence. Myers v. AT & T, 380 N.J. Super. 443, 452-53 (App. Div. 2005). "The familiar elements of th[is] analytical framework" are as follows:

> (1) proof by plaintiff of the prima facie elements of discrimination; (2) production by [defendant] of a legitimate, non-discriminatory reason for the adverse . . . action [or inaction]; and (3) demonstration by plaintiff that the reason so articulated is not the true reason for the adverse . . . action [or inaction], but is instead a pretext for discrimination.
>
> [Id. at 452.]

Under that framework, a plaintiff must first and foremost prove the elements of his or her prima facie case. Victor v. State, 203 N.J. 383, 408 (2010). The plaintiff's "evidentiary burden at the prima facie stage is 'rather

modest: it is to demonstrate to the court that plaintiff's factual scenario is compatible with discriminatory intent—i.e., that discrimination could be a reason for the [defendant]'s action,' . . . irrespective of defendant['s] efforts to dispute [plaintiff's] evidence." Meade, 249 N.J. at 329 (Zive v. Stanley Roberts, Inc., 182 N.J. 436, 447-48 (2005)). Only after a plaintiff successfully establishes a prima facie case will a presumption arise "that the [defendant] unlawfully discriminated against the plaintiff." Grande v. Saint Clare's Health Sys., 230 N.J. 1, 18 (2017) (quoting Clowes v. Terminix Int'l, Inc., 109 N.J. 575, 596 (1988)).

"There is no single prima facie case that applies to all employment discrimination claims." Victor, 203 N.J. at 408. Rather, the elements a plaintiff must prove are defined by "the particular cause of action." Ibid. NJLAD discrimination claims share similar, broad elements, regardless of the particular cause of action, which a plaintiff is required to prove, including: (1) they are a member of a class protected by the NJLAD; (2) they were qualified for a benefit offered by the defendant; (3) defendant denied plaintiff the benefit sought; and (4) others, who are not members of the same protected class, with the same qualifications received the benefit sought. See, e.g., id. at 408-09.

22

Here, plaintiff argues she suffered from generalized anxiety disorder and obesity, which she claims constitute disabilities under the NJLAD.

### A. Disparate Treatment Based on Disability

The NJLAD defines disability as a

> physical or sensory disability, infirmity, malformation, or disfigurement which is caused by bodily injury, birth defect, or illness including epilepsy and other seizure disorders, and which shall include, but not be limited to, any degree of paralysis, amputation, lack of physical coordination, blindness or visual impairment, deafness or hearing impairment, muteness or speech impairment, or physical reliance on a service or guide dog, wheelchair, or other remedial appliance or device, or any mental, psychological, or developmental disability, including autism spectrum disorders, resulting from anatomical, psychological, physiological, or neurological conditions which prevents the typical exercise of any bodily or mental functions or is demonstrable, medically or psychologically, by accepted clinical or laboratory diagnostic techniques. Disability shall also mean AIDS or HIV infection.
>
> [N.J.S.A. 10:5-5(q).]

"Where the existence of a handicap is not readily apparent, expert medical evidence is required." Viscik v. Fowler Equip. Co., 173 N.J. 1, 16 (2002). Accordingly, courts place a high premium on the use and strength of objective medical testimony in proving the specific elements of each test contained in the statute. Id.

23

The analysis of disparate treatment claims relies on the burden-shifting framework the United States Supreme Court established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  Gerety v. Atl. City Hilton Casino Resort, 184 N.J. 391, 399 (2005).  A prima facie case of disparate treatment requires a demonstration that: (1) the plaintiff belongs to a protected class; (2) he or she "applied for or held a position for which he or she was objectively qualified"; (3) he or she "[was] not hired or was terminated from that position; and (4) the employer sought to, or did fill the position with a similarly-qualified person." Ibid.  If the plaintiff proves the prima facie elements, "[t]he burden then shifts to the employer to prove a legitimate, non-discriminatory reason for the employment action."  Ibid.  Then, the plaintiff has the final burden to demonstrate "the employer's proffered reason was merely pretext for the discrimination." Ibid.

Plaintiff argues that her obesity qualifies as a disability for two reasons. First, plaintiff is a 5'9" woman with a weight that fluctuates between 250 and 300 pounds.  Plaintiff claims:  (1) she has been struggling with her weight since 2000; (2) her weight adversely affects her health and well-being, such as increasing her risk for respiratory illness, chronic back problems, and spinal stenosis; (3) she developed drop foot syndrome due to pinched nerves resulting

from lumbar radiculopathy, disc excursion, and disc herniations; and (4) her immobility has increased. Second, obesity has placed plaintiff in a high-risk category for severe illness from COVID-19.

In addition, plaintiff contends that her generalized anxiety disorder qualifies as a disability. Plaintiff asserts that the court did not view the facts, specifically the text messages and her deposition testimony, in her favor. Plaintiff argues there is a "reciprocal relationship" between her weight and her overall health. Citing Viscik, plaintiff claims a spinal injury following chronic back problems and spinal stenosis from years of high body mass index and an inability to lose weight establishes her obesity is caused by bodily injury.

Plaintiff's case is distinguishable from Viscik. In that case, the plaintiff's morbid obesity was considered a disability under the NJLAD because: (1) the plaintiff was suffering from a disease or pathology as a result of her obesity, and her obesity based arthritis, heart condition, and obstructive lung disease were clearly "physical infirmities"; and (2) medical testimony established the plaintiff's morbid obesity was caused by a genetic metabolic condition that she suffered from since birth. Viscik, 173 N.J. at 17-18.

Here, plaintiff stated that she has been struggling with her weight since 2000. Saliently, in contrast to Viscik, plaintiff did not provide any medical

25

documentation whatsoever or expert medical reports to establish what bodily injury, birth defects, or illness caused her obesity and struggle to lose weight. Plaintiff admits she did not seek treatment for her obesity until 2023, years after her termination.

As we stated in Dickson v. Cmty. Bus Lines, Inc., obesity is not a disability unless it has an underlying medical cause, a condition that plaintiff clearly failed to establish in this case. 458 N.J. Super. 522, 532 (App. Div. 2019). Therefore, we conclude plaintiff's obesity cannot be considered a disability invoking NJLAD protection.

In a similar vein, plaintiff's generalized anxiety disorder is not supported by expert medical evidence as required by Viscik. Plaintiff relies on text messages between her coworkers to show that she conveyed anxiety and fear about the COVID-19 pandemic. Plaintiff also relies upon her deposition testimony that she was diagnosed with generalized anxiety disorder around 2008 and treated after her stepfather's passing. Plaintiff claimed she was treated and was prescribed medication for depression, anxiety, sleeplessness, and "worry" by numerous doctors, but did not provide documentary evidence to support her claim.

A-0272-23

Moreover, when viewing the facts favorable to plaintiff, the record does not establish that her generalized anxiety disorder prevented the normal exercise of any bodily or mental functions and is not considered by any accepted clinical or laboratory diagnostic techniques. The undisputed facts show plaintiff was living in Jersey City and later moved to New York City. She was able to commute to RMTS's office for work, except when her stepfather passed.

There is no medical documentation contained in the record that plaintiff was diagnosed or treated for generalized anxiety disorder or that RMTS was made aware of this alleged condition. Thus, based upon our de novo review, the court was correct in its analysis in dismissing plaintiff's NJLAD claim.

Furthermore, plaintiff provided no evidence that her conditions existed during her employment at RMTS. In fact, plaintiff testified at her deposition that she had no medically imposed physical limitations. And, plaintiff never claimed to be limited in the performance of her duties at RMTS because of any condition. Instead, plaintiff relies on self-serving declarations in support of her NJLAD claim. The court aptly highlighted that plaintiff failed to produce any documentation confirming her alleged disabilities. The record supports that determination.

27

Equally unavailing is plaintiff's argument that RMTS failed to reasonably accommodate her under the NJLAD. Plaintiff asserts RMTS failed to engage her in the legally required interactive process of reasonable accommodation, which requires a determination by a fact-finder. We disagree.

New Jersey courts have consistently held that the NJLAD "requires an employer to reasonably accommodate an employee's handicap." Tynan v. Vicinage 13 of the Super. Ct., 351 N.J. Super. 385, 396 (App. Div. 2002); see also Viscik, 173 N.J. at 11. A failure to accommodate claim requires proof of a NJLAD discrimination claim. Bosshard v. Hackensack Univ. Med. Ctr., 345 N.J. Super. 78, 91 (App. Div. 2001). To prove a failure to accommodate claim against an employer, a plaintiff must demonstrate that he or she: (1) "had a [NJ]LAD handicap; (2) [were] qualified to perform the essential functions of the job, with our without accommodation; and (3) suffered an adverse employment action because of the handicap." Ibid.

"An employer's duty to accommodate extends only so far as necessary to allow 'a disabled employee to perform the essential functions of [his or her] job. It does not require acquiescence to the employee's every demand.'" Tynan, 351 N.J. Super. at 397 (quoting Vande Zande v. State of Wis. Dep't of Admin., 851 F. Supp. 353, 362 (W.D. Wis. 1994)).

An employee's request for an accommodation need not be in writing or even use the phrase "reasonable accommodation." Id. at 400 (quoting Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 313 (3d. Cir. 1999)). The employee is not required to use magic words or expressly state they are seeking accommodation, but they "must make clear that . . . assistance [is desired] for [their] . . . disability." Ibid. (first alteration in original) (quoting Jones v. United Parcel Serv., 214 F.3d 402, 408 (3d Cir. 2000)). The employer must engage in "an informal interactive process with the employee." Ibid. (citing 29 C.F.R. § 1630.2(o)(3)). This requires the employer to "identify the potential reasonable accommodations that could be adopted to overcome the employee's precise limitations resulting from the disability. Once a handicapped employee has requested assistance, it is the employer who must make the reasonable effort to determine the appropriate accommodation." Ibid. (internal citations omitted).

Here, the court correctly found that plaintiff presented no evidence she was disabled. Therefore, RMTS had no legal obligation to accommodate plaintiff. See Victor, 203 N.J. at 422 (holding that since there was no evidence in the record of the plaintiff being disabled, the plaintiff's "proofs on the prima facie case for failure to accommodate . . . would fail on the first prong, without regard to how we articulate any of the other elements of his proofs"); Viscik,

29

173 N.J. at 17 (noting that "regardless of what category of handicap, physical or non-physical, that is invoked by plaintiff, each and every element of the relevant statutory test must be satisfied").

Plaintiff has produced no evidence that RMTS's reasons for terminating her were pretextual. Nor has plaintiff determined that RMTS was motivated by discriminatory intent. Therefore, the NJLAD claim set forth in count two of the amended complaint was properly dismissed. In light of our analysis, we need not address the dismissal of the third and fourth counts of the amended complaint.

We conclude the remaining arguments—to the extent we have not addressed them—lack sufficient merit to warrant any further discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0272-23