924 A.2d 435

MICHAEL J. RASPA, JR., PLAINTIFF–RESPONDENT, v.
OFFICE OF THE SHERIFF OF THE COUNTY OF
GLOUCESTER, DEFENDANT–APPELLANT.

June 12, 2007—Argued February 13, 2007—Decided June 12, 2007.

324

*William M. Tambussi,* argued the cause for appellant (*Brown & Connery, LLP,* attorneys).

*David A. Avedissian,* argued the cause for respondent (*David A. Avedissian, Esq., LLC,* attorneys).

Justice RIVERA–SOTO delivered the opinion of the Court.

This appeal requires that we address the threshold question of whether, as a matter of law, an employee can prosecute a claim alleging that his employer failed to accommodate the employee's disability in violation of the Law Against Discrimination, *N.J.S.A.* 10:5–1 to –49 (LAD), when the employee's permanent disability renders him unable to discharge essential functions of the position in which he was employed. In this case, a county corrections officer developed a disabling disease that, in his doctor's words, required that the corrections officer "be in an environment with minimum to no contact with prison inmates to insure minimum risk [to the corrections officer.]" After placing the corrections officer in several temporary light duty assignments over a three-year period, the county sheriff's office determined that it could not continue to extend light duty work to the permanently disabled corrections officer and processed his involuntary disability retirement.

We hold that an employee must possess the bona fide occupational qualifications for the job position that employee seeks to occupy in order to trigger an employer's obligation to reasonably accommodate the employee to the extent required by the LAD. In that context, we further hold that an employer may reasonably limit light duty assignments to those employees whose disabilities are temporary, and that the availability of light duty assignments for temporarily disabled employees does not give rise to any additional duty on the part of the employer to assign a permanently disabled employee indefinitely to an otherwise restricted light duty assignment.

## I.

On July 9, 1984, plaintiff Michael J. Raspa, Jr. was hired by defendant, the Sheriff of Gloucester County, as a corrections officer assigned to the Gloucester County Jail in Woodbury, New Jersey. Plaintiff discharged his employment duties without incident until October 1997, when he was diagnosed with a hyperac-

tive thyroid, or Graves' disease.[1] In order to limit his thyroid functions, plaintiff was treated with radioactive iodine. As a corollary, plaintiff also developed Graves' ophthalmopathy, a condition resulting in bulging eyes and possible double vision.[2] There is no treatment to stop the immune system from producing the antibodies that cause Graves' disease or its corollary, Graves' ophthalmopathy; that is, there presently is no cure. However, Graves' disease can be managed by either decreasing the production of, or blocking the action of, the hormone thyroxine. Similarly, the symptoms of Graves' ophthalmopathy can be managed by medications or surgery.

Plaintiff continued discharging his regular and usual duties as a corrections officer until February 1999 when, due to his degenerating Graves' ophthalmopathy, plaintiff's then-treating physician issued a doctor's note stating that she expected that plaintiff's eye symptoms would "worsen" as a result of his daily radiation treatments, and "request[ing] he not supervise inmates." Complying with this request, defendant placed plaintiff on "restricted duty status" and reassigned him to light duty positions at several locations and with different functions within the county jail system. Each of these light duty positions had a common denominator: they involved no immediate contact with inmates.

Four months later, in June 1999, defendant issued a general order addressing who would be eligible for assignment to those light duty positions. Distinguishing between corrections officers who had been injured on the job and those, like plaintiff, who were not suffering from a job-related disability, the general order

---

[1] According to the Mayo Clinic, "Graves' disease is the most common form of hyperthyroidism. It occurs when your immune system mistakenly attacks your thyroid gland and causes it to overproduce the hormone called thyroxine." *Mayo Clinic, http://www.mayoclinic.com/health/graves-disease/DS00181.*

[2] "In Graves' ophthalmopathy, [the] eyeball bulges out past its protective orbit. This occurs as tissues and muscles behind [the] eyes swell and cause [the] eyeball to move forward." *Mayo Clinic, http://www.mayoclinic.com/health/graves-disease/DS00181/DSECTION=2.*

limited to thirty days any light duty assignment for someone who was not injured on the job. As a result of that order, defendant, although willing to accommodate those corrections officers who were not injured on the job, gave preference to and priority for the few available light duty assignments to those who had been injured on the job.

Despite the temporal limitation on light duty assignments contained in the general order, plaintiff continued in inmate-contact-restricted assignments until January 2002, when defendant asked that plaintiff provide an updated doctor's note concerning his condition. Plaintiff's then-physician, Dr. Nicos Nicolaou, of the Department of Radiation Oncology of the Fox Chase Cancer Center, wrote that plaintiff "need[ed] to be in a work environment with minimum to no contact with prison inmates to insure minimum risk of eye trauma due to his Grave's [sic] disease." Upon receipt of Dr. Nicolaou's letter and at defendant's request, plaintiff submitted to an examination by defendant's physician, who disagreed and cleared plaintiff for unrestricted duty.

Consistent with its June 1999 general order, on June 10, 2002, defendant wrote a memorandum to Gloucester County's personnel director, explained that plaintiff was employed as a county corrections officer and "an active member of the Police and Firemen's Retirement System (PFRS)[,]" and, referencing Dr. Nicolaou's letter, noted:

> It is our opinion that the most recent medical report (attached) from [plaintiff's] physician specifically states that he is to have NO contact with inmates as part of his job function. The Sheriff's Department cannot comply, nor guarantee this type of "no contact" policy.
>
> The assignment of light duty in an atmosphere where physical contact and confrontation are always possible must be viewed as detrimental to [plaintiff's] condition and personal safety.
>
> I have done all that I can to accommodate [plaintiff], but I have no other options of placing him in a "positively safe environment." I can no longer assure him, or the county, that he will not be injured. *Therefore, it is necessary at this time that I regret to request that [plaintiff] be placed on disability retirement.*

The next day, plaintiff secured a second letter from Dr. Nicolaou. Differing from his earlier statement that plaintiff "need[ed] to be

in a work environment with minimum to no contact with prison inmates to insure minimum risk of eye trauma[,]" Dr. Nicolaou now opined as follows: "Please continue light duty. [Plaintiff] needs to be in a work environment with limited contact with prison inmates to insure minimum risk of eye trauma due to his Grave's [sic] disease." Thus, once defendant raised the prospect of discontinuing plaintiff's light duty assignments and placing him on disability retirement, plaintiff's job needs changed from one "with *minimum to no contact* with prison inmates" to one "with *limited contact* with prison inmates." (Emphasis supplied).

Armed with his new doctor's note, on June 19, 2002, plaintiff wrote to Gloucester County's personnel director and advised that he was aware that an application for permanent disability retirement benefits was being processed on his behalf, something plaintiff described as "an event I do not wish to take place." He explained that "[i]t has been over three years now since my condition was diagnosed" and that "[i]n this time, during which my symptoms have steadily improved, light duty work that falls within my job description has been made available to me." Underscoring that "[t]his work is still available[,]" plaintiff asserted that he "ha[d] performed [his] job more than satisfactorily while on light duty." Thus, plaintiff "request[ed] to remain on light duty status as in the past."

By a letter dated June 27, 2002, defendant responded. It reminded plaintiff that, "[b]ased on previous discussions, you are well aware that the Gloucester [C]ounty Sheriff's Department can[ ]not fully comply with your most recent doctor['s] note." Defendant explained that, after discussions with "the County Personnel Director as well as County Legal Counsel ... regrettably, we must inform you that your disability retirement is to be effective July 1, 2002." The involuntary application for plaintiff's disability retirement ultimately was approved by the Board of Trustees of the PFRS. At the time of his involuntary disability retirement, plaintiff had been employed as a corrections officer in Gloucester County for eighteen years.

Plaintiff neither participated in the application process for involuntary disability retirement benefits commenced by defendant, nor did he grieve that employment action.[3] Instead, he filed suit alleging that defendant had violated the LAD by failing to reasonably accommodate plaintiff's disability.[4] According to plaintiff, defendant could have accommodated plaintiff by permanently assigning him to existing positions with limited inmate contact and could have insured his safety through the use of protective goggles. Defendant denied those allegations.

At trial, plaintiff conceded that the specifications of a county corrections officer issued by the New Jersey Department of Personnel (NJDOP) define the essential functions of a county corrections officer and require contact with inmates. He also admitted that his disability did not allow him to respond to another corrections officer's emergency call for assistance. Plaintiff nonetheless maintained that, although he could not perform all of the duties of a corrections officer, he could have—and had in fact—performed some of them without ever receiving an unsatisfactory evaluation. Although plaintiff's doctor testified that plaintiff could have worn protective goggles and that their use "would minimize [any additional risk that plaintiff might suffer as a result of eye trauma] as much as the next person[,]" plaintiff conceded that he "never once brought up this possible accommodation of wearing protective eye goggles with anyone in the sheriff's department[.]"

---

[3] Plaintiff, as a member of the Gloucester County Law Enforcement Lodge # 97 of the Fraternal Order of Police, was entitled to the benefits of the collective negotiations agreement between his union and Gloucester County, including its grievance procedure.

[4] Plaintiff's complaint also alleged that defendant's failure to reasonably accommodate his disability ran afoul of the Americans with Disabilities Act, 42 U.S.C. §§ 12101 to 12213 (ADA). On defendant's pre-trial motion, plaintiff's ADA claim was dismissed and plaintiff did not appeal that dismissal. Therefore, plaintiff's ADA claim is not before us.

The jury found in favor of plaintiff and awarded economic damages for the period between the date of plaintiff's involuntary retirement and June 30, 2009 [5] in the amount of $236,000 and future economic damages in an amount to be ascertained by the trial court. The trial court later reversed the jury's award of future economic damages, but awarded plaintiff his attorney's fees and costs, and entered an aggregate judgment in favor of plaintiff in the amount of $273,000. At the same time, the trial court denied defendant's post-trial motions and plaintiff's motion to enhance his counsel fee award.

Defendant appealed, raising nine separate issues: that (1) defendant did not have a legal duty to convert a temporary light duty position into a permanent one; (2) the case should not have proceeded to trial because plaintiff could not perform the essential functions of a corrections officer; (3) plaintiff proffered insufficient expert evidence as to his disability; (4) the trial court did not have jurisdiction to adjudicate plaintiff's LAD claim under the doctrine of collateral estoppel; (5) the trial court erred in precluding defendant from cross-examining plaintiff with records from the Division of Pensions in respect of plaintiff's knowledge of his right to appeal an involuntary retirement determination; (6) the trial court improperly submitted to the jury the issue of future damages without a financial or actuarial expert and failed to properly instruct the jury as to that issue; (7) plaintiff did not mitigate his damages; (8) the trial court should have granted defendant's motions in limine to exclude certain evidence; and (9) plaintiff's counsel committed misconduct in his summation. Plaintiff cross-appealed, claiming that the trial court's refusal to enhance his attorney's fee award was error.

The Appellate Division, in an unpublished opinion, affirmed in all respects. The panel explained that "[w]hen an employer

---

[5] Had plaintiff's employment with defendant not been interrupted by his involuntary disability retirement, he would have reached twenty-five years of service as of that date, entitling him to retire with full retirement benefits.

maintains it reasonably concluded the employee's handicap precluded performance of the 'essential functions of the job even with the reasonable accommodation,' ... and then terminates the employee for that reason, the burden of proof is on the employer." (quoting *N.J.A.C.* 13:13–2.8(a); citing *Jansen v. Food Circus Supermarkets, Inc.*, 110 *N.J.* 363, 383, 541 *A.2d* 682 (1988); *Ensslin v. Twp. of N. Bergen*, 275 *N.J.Super.* 352, 363, 646 *A.2d* 452 (App.Div.1994), *certif. denied*, 142 *N.J.* 446, 663 *A.2d* 1354 (1995)). Based on that burden allocation, the Appellate Division rejected defendant's reliance "on the principle that an employer is 'not required to transform its temporary light duty jobs into permanent jobs to accommodate [an employee's] disability.'" (quoting *Mengine v. Runyon*, 114 *F.*3d 415, 418 (3d Cir.1997)). The panel ultimately concluded that "[s]ufficient evidence was presented to the jury for it to reasonably conclude that [plaintiff] adequately performed the essential functions of a Corrections Officer in an existing position, which appropriately accommodated [plaintiff's] handicap, and to find that the proposed accommodation would not be too burdensome to [defendant]."

We granted defendant's petition for certification, 188 *N.J.* 493, 909 *A.2d* 727 (2006), and, for the reasons that follow, we reverse the judgment of the Appellate Division and remand the cause to the Law Division for entry of a judgment in favor of defendant.

## II.

Defendant's main argument is that, as a matter of law, it was entitled to judgment in its favor on plaintiff's LAD claim. In defendant's view, because plaintiff's disability permanently rendered him unable to have contact with inmates—an essential function of a corrections officer—he was unqualified for the position. Because an employer does not have a duty to reasonably accommodate an unqualified employee, reasons defendant, plaintiff does not qualify for the LAD's protections. Defendant also asserts that, inasmuch as the NJDOP specifications for a county corrections officer "set[ ] forth the essential functions of a correc-

tions officer, enumerating many of the essential functions of the job as requiring inmate contact[,]" the Appellate Division erred in failing to consider them. Finally, it urges that the duty to reasonably accommodate cannot extend to requiring that it convert a temporary light duty position into a permanent position.[6]

Plaintiff responds that the jury verdict was supported by the record evidence and, thus, was proper. He argues that because the NJDOP job specifications provide that "[a] particular position using this title may not perform all duties listed in this job specification [and c]onversely, [that] all duties performed on the job may not be listed[,]" those job specifications do not conclusively define the essential functions of a corrections officer.

## III.

This appeal arises in the context of the trial court's denial of defendant's motion for judgment notwithstanding the verdict and for a new trial. Thus, in respect of the factual findings below, we "accept as true all the evidence supporting [plaintiff] and accord him all legitimate inferences[,]" *Zive v. Stanley Roberts, Inc.*, 182 *N.J.* 436, 441, 867 *A.*2d 1133 (2005), bearing in mind that "the trial court's 'action[s] should not be disturbed unless it clearly and unequivocally appears there was a manifest denial of justice under the law[,]' " *Dolson v. Anastasia*, 55 *N.J.* 2, 8, 258 *A.*2d 706 (1969) (quoting *Hartpence v. Grouleff*, 15 *N.J.* 545, 549, 105 *A.*2d 514 (1954)). The standard we apply to the review of issues of law, however, is different. On appeal, " 'matters of law are subject to a de novo review.' " *Toll Bros., Inc. v. Twp. of W. Windsor*, 173 *N.J.* 502, 549, 803 *A.*2d 53 (2002) (quoting *Balsamides v. Protameen Chem., Inc.*, 160 *N.J.* 352, 372, 734 *A.*2d 721 (1999)). Specifically, "[a] trial court's interpretation of the law and the legal consequences that flow from established facts are

---

[6] Defendant also argues that the Appellate Division erred when it inconsistently found that the issue of future damages should not have been presented to the jury, but nevertheless affirmed the entire jury verdict. Because the grounds on which we decide this case render that issue moot, we need not address it.

not entitled to any special deference." *Manalapan Realty, L.P. v. Twp. Comm. of Manalapan,* 140 *N.J.* 366, 378, 658 *A.*2d 1230 (1995). It is against this latter standard—the de novo review of the trial court's conclusions of law—that we gauge the vitality of plaintiff's claim.

A.

"We begin by recognizing that the clear public policy of this State is to abolish discrimination in the work place. Indeed, the overarching goal of the [LAD] is nothing less than the eradication of the cancer of discrimination." *Fuchilla v. Layman,* 109 *N.J.* 319, 334, 537 *A.*2d 652 (citation and internal quotation marks omitted), *cert. denied,* 488 *U.S.* 826, 109 *S.Ct.* 75, 102 *L.Ed.*2d 51 (1988). Our analysis must start from that premise because "[e]mployment discrimination is not just a matter between employer and employee. The public interest in a discrimination-free work place infuses the inquiry." *Id.* at 335, 537 *A.*2d 652. We recently explained that "[t]he LAD is one of New Jersey's leading legislative pronouncements that set forth the familiar proposition that the clear public policy of this State is to eradicate invidious discrimination from the workplace[,]" *Carmona v. Resorts Int'l Hotel, Inc.,* 189 *N.J.* 354, 370, 915 *A.*2d 518 (2007) (internal quotation marks omitted); that "[f]reedom from discrimination is one of the fundamental principles of our society[; and that] the LAD is the Legislature's attempt to protect society from the vestiges of discrimination[,]" *L.W. v. Toms River Reg'l Schs. Bd. of Educ.,* 189 *N.J.* 381, 399, 915 *A.*2d 535 (2007) (citations and internal quotation marks omitted). We have long held that we apply the LAD liberally, *Fraser v. Robin Dee Day Camp,* 44 *N.J.* 480, 486, 210 *A.*2d 208 (1965); *Levitt & Sons, Inc. v. Div. Against Discrimination,* 31 *N.J.* 514, 524, 158 *A.*2d 177, *appeal dismissed,* 363 *U.S.* 418, 80 *S.Ct.* 1257, 4 *L.Ed.*2d 1515 (1960), a mandate repeated by the Legislature. *N.J.S.A.* 10:5-3 (stating that "[t]he Legislature intends that ... [the LAD] shall be liberally construed"). We reaffirm once again those core principles.

That said, the LAD's reach, although broad, is not without limitation. It forbids "any unlawful discrimination against any person because such person is or has been at any time disabled or any unlawful employment practice against such person, *unless* the nature and extent of the disability reasonably precludes the performance of the particular employment." *N.J.S.A.* 10:5–4.1 (emphasis supplied). To give meaning to that caveat requires the conclusion that, unless an employee's "disability reasonably precludes the performance of the particular employment[,]" *ibid.*, discrimination in employment on the basis of a disability or handicap is prohibited. *See also N.J.S.A.* 10:5–29.1 (providing that "[u]nless it can be clearly shown that a person's disability would prevent such person from performing a particular job, it is an unlawful employment practice to deny to an otherwise qualified person with a disability the opportunity to obtain or maintain employment . . . solely because such person is a person with a disability"). The LAD explicitly acknowledges this limitation, when it provides that "[n]othing contained in this act . . . shall be construed . . . to prohibit the establishment and maintenance of bona fide occupational qualifications[.]" *N.J.S.A.* 10:5–2.1.

 We have explained that "[t]he import of the [LAD] is that the handicapped should enjoy equal access to employment, subject only to limits that . . . cannot [be] overcome." *Jansen v. Food Circus Supermarkets, Inc., supra,* 110 *N.J.* at 374, 541 *A.*2d 682. We have emphasized that, "[b]ecause of the limits imposed by a handicap, the [LAD] must be applied sensibly with due consideration to the interests of the employer, employee, and the public." *Ibid.* Under the LAD, " 'an employer found to have reasonably arrived at an opinion that a job applicant cannot do the job, either because the applicant is unqualified or because of a given handicap, cannot be found liable for discrimination against that applicant.' " *Ibid.* (quoting *Andersen v. Exxon Co.,* 89 *N.J.* 483, 497, 446 *A.*2d 486 (1982)). The LAD "leave[s] the employer with the right to fire or not to hire employees who are unable to perform the job, 'whether because they are generally unqualified

or because they have a handicap that in fact impedes job perform-
ance.' " *Ibid.* (quoting *Andersen, supra,* 89 *N.J.* at 496, 446 *A.*2d
486).

Because the threshold question of law that must be addressed is
whether the "disability reasonably precludes the performance of
*the particular employment*[,]" *N.J.S.A.* 10:5–4.1 (emphasis sup-
plied), we turn to the qualifications of the position at issue in
respect of plaintiff's employment with defendant and determine
whether plaintiff was able to perform that particular employment.[7]

### B.

The specifications for a county corrections officer have been
defined by the NJDOP. Under Job Specification 01400, NJDOP
defines a "county correction[s] officer" as follows: "Under supervi-
sion during an assigned tour of duty at a correctional facility,
guard inmates serving court imposed sentences for the commis-
sion of criminal offenses; does other related duties." *New Jersey
Department of Personnel, Job Specification 01400, http://webapps.
dop.state.nj.us/jobspec/01400.htm.* Among the examples of work
of a county corrections officer listed by NJDOP are several that
require close inmate contact. These include "[p]atrol[ling] cell
block areas, tiers, grounds and corridors[;]" "[e]scort[ing] groups
of inmates during movements within or outside the institution to
prevent disorder or breaches in security[;]" "[p]hysically re-
strain[ing] inmates when necessary to prevent injuries to staff and
other inmates and to maintain security[;]" and "[s]earch[ing] in-
mates cells/dormitories in accord with established policies/regula-
tions/procedures to find contraband articles." *Ibid.* Tellingly, in
the "medical examination" portion of this job specification, it

---

[7] We reject, and are not bound by, plaintiff's claim that another permanently
disabled employee was assigned indefinitely to light duty work by defendant and,
hence, he should be treated no differently. That work assignment was the result
of a collectively bargained arbitration proceeding; the arbitration agreement
between defendant and its corrections officers cannot govern the development of
our law under the LAD.

explains that "[a]ny medical or physical condition or defect which would prevent efficient performance of duties of the position, cause the appointee to be a hazard to himself/herself or others, or become aggravated as a result of performance of these duties, will be cause for rejection" and that the "[f]ailure to demonstrate sufficient capacity to perform duties of this position may be cause for rejection." *Ibid.*

Finally, in the "knowledge and abilities" section of that job specification, it is required that a county corrections officer have the "[a]bility to cope with crisis situations." *Ibid.* NJDOP recognized the LAD's reach when it added that "[p]ersons with mental or physical disabilities are eligible so long as they can perform the essential functions of the job after reasonable accommodation is made to their known limitations." *Ibid.* However, that recognition is not without qualification: "[i]f the accommodation cannot be made because it would cause the employer undue hardship, such persons may not be eligible." *Ibid.*

 Plaintiff admitted that he knew that NJDOP's description of the position of county corrections officer was controlling and that having contact with inmates was an essential function of the job. He also conceded that, given the medical limitations placed on him, he simply was unable to perform any of the essential functions that involved contact with inmates. Further, the proofs demonstrated that no objectively viable and reasonable accommodation would ever make plaintiff qualified to perform the functions he admitted were essential to the position of a county corrections officer.[8] The conclusion to which those admissions, concessions and proofs lead is inescapable: plaintiff's "disability reasonably preclude[d] the performance of the particular employment [of a county corrections officer]," *N.J.S.A.* 10:5–4.1. Because it has

---

[8] Although plaintiff suggested at trial that wearing protective goggles would allow him to have inmate contact, he admitted he "never once brought up this possible accommodation of wearing protective goggles with anyone in the sheriff's department[.]"

been "clearly shown that [plaintiff's] disability would prevent [him] from performing [that] particular job[,]" *N.J.S.A.* 10:5–29.1, plaintiff, as a matter of law, was not qualified as a "county corrections officer." Hence, plaintiff's asserted "accommodation"—providing plaintiff an indefinite light duty posting with no inmate contact—was not "reasonable" under the LAD.

### C.

Plaintiff nevertheless argues that he was assigned to light duty work that minimized, if not eliminated, contact with the inmates for a period of three years preceding his involuntary retirement and, therefore, that accommodation should have been continued indefinitely. Defendant responds that, by general order, it gave preference for light duty assignments to those who had suffered on-the-job injuries and that, in any event, persons whose inability to perform all of the essential job functions due to other than on-the-job injuries would be limited to light duty assignments not to exceed thirty days. According to defendant, the duty to reasonably accommodate a disability does not translate into the required conversion of a temporary, light duty job into a permanent placement.

■ "[T]he phrase 'reasonable accommodation' refers to the duty of an employer to attempt to accommodate the *physical disability* of the employee, *not* to a duty on the part of the employer to acquiesce to the disabled employee's requests for certain benefits or remuneration." *Jones v. Aluminum Shapes, Inc.,* 339 *N.J.Super.* 412, 426, 772 *A.*2d 34 (App.Div.2001). As the Appellate Division has stated:

> the LAD does not require an employer to create a permanent part-time position for a disabled employee if no suitable full-time position exists. Nor does the LAD require an employer to create a permanent light-duty position to replace a medium-duty one. Rather, an employer must simply make all reasonable accommodations to an employee returning from disability leave and allow the employee a reasonable time to recover from his injuries.

> [*Muller v. Exxon Research and Eng'g Co.,* 345 *N.J.Super.* 595, 608, 786 *A.*2d 143 (App.Div.2001), *certif. denied,* 172 *N.J.* 355, 798 *A.*2d 1269 (2002).]

This rule is also embraced by the federal courts—specifically, the United States Court of Appeals for the Third Circuit—in the parallel contexts of the ADA and the Rehabilitation Act of 1973, 29 *U.S.C.* §§ 701 to 796*l.* *See Turner v. Hershey Chocolate USA,* 440 *F.*3d 604, 614 (3d Cir.2006) (holding that "[t]he ADA does not require an employer to create a new position in order to accommodate an employee with a disability, or transform a temporary light duty position into a permanent position"); *Buskirk v. Apollo Metals,* 307 *F.*3d 160, 169 (3d Cir.2002) (concluding that "[t]he ADA does not require an employer to create a new position to accommodate an employee with a disability"); *Mengine v. Runyon,* 114 *F.*3d 415, 418 (3d Cir.1997) (holding that, under analogous provisions of Rehabilitation Act, employer "was not required to transform its temporary light duty jobs into permanent jobs to accommodate [employee]'s disability"); *Shiring v. Runyon,* 90 *F.*3d 827, 832 (3d Cir.1996) (holding that, under Rehabilitation Act, employee bears burden of "demonstrat[ing] that there were vacant, funded positions whose essential duties he was capable of performing, with or without reasonable accommodation, and that these positions were at an equivalent level or position").

The common sense reasoning that undergirds those authorities is compelling. Those employers maintained a limited number of light duty positions as staging areas where injured employees can recuperate and return to their full-time jobs while still being productive. The light duty positions were not intended to be a permanent post, but a temporary way station or bridge between an inability to work due to injury and a return to full employment status; they are intended as a shield to protect the temporarily disabled, and not as a sword by which a person who is otherwise unqualified for the position can demand a permanent posting. We embrace the reasoning of the Appellate Division in *Jones* and *Muller* and hold that the LAD does not require that an employer create an indefinite light duty position for a permanently disabled employee if the employee's disability, absent a reasonable accommodation, renders him otherwise unqualified for a full-time, full-duty position. Thus, consistent with the LAD, an employer

may reasonably limit light duty assignments to those employees whose disabilities are both temporary and not inconsistent with the duties of the light duty assignment, and, conversely, the availability of light duty assignments for temporarily disabled employees does not give rise to any additional obligation on the part of the employer to assign indefinitely a permanently disabled employee to an otherwise restricted light duty assignment.

In closing, we add the following two points. An employer may, consistent with the LAD, terminate the employment of an employee who, after consideration of available reasonable accommodations, nevertheless is no longer able to perform the essential functions of his job. However, the employer is not obliged to do so. Many employers—on either a temporary or long-term basis—seek to retain disabled employees in either modified or different job postings. We laud those efforts, and nothing in this opinion should be read to discourage them or to permit them to be turned against an employer.

Moreover, our review of plaintiff's LAD claim also is informed by the alternatives statutorily available to plaintiff and in fact provided by defendant. Unlike an outright employment termination in the private sector, defendant addressed plaintiff's admitted inability to perform the essential functions of his job by activating the disability retirement remedies provided by the Legislature under the PFRS. *See N.J.S.A.* 43:16A–1 to –68. Thus, according to defendant's evidence at trial, in lieu of terminating plaintiff's employment—an action that would have resulted in plaintiff receiving a pension of forty percent of his pay—defendant triggered the disability retirement safety net the Legislature designed for instances such as this, which entitled plaintiff to a pension equal to fifty percent of his pay, plus health benefits because "that way [plaintiff] would get more money." [9] Plaintiff did not claim that defendant's actions in placing plaintiff on

---

[9] At trial, the amount of the retirement benefits plaintiff in fact received appeared to be disputed, but was neither fully addressed nor resolved.

disability retirement status were motivated by either ill-will or an improper discriminatory animus. In the absence of any such proofs, defendant's actions in terminating plaintiff's employment cannot be said to have contravened the LAD as a matter of law.

## IV.

The judgment of the Appellate Division is reversed and the matter is remanded to the Law Division with instructions to enter judgment in favor of defendant.

Justice LONG, dissenting.

I would affirm the decision of the Appellate Division substantially for the reasons expressed in the thorough and thoughtful opinion of that court. In this Law Against Discrimination (LAD) case, the panel ruled that "[s]ufficient evidence was presented to the jury for it to reasonably conclude that Raspa adequately performed the essential functions of a Corrections Officer in an existing position, which appropriately accommodated Raspa's handicap, and to find that the proposed accommodation would not be too burdensome to the Sheriff." Those conclusions are legally unexceptionable.

The jury was presented with a genuine issue of fact regarding whether inmate contact was essential to the function of a corrections officer. The Sheriff's Office relied on the New Jersey Department of Personnel (NJDOP) job specifications that detailed inmate contact responsibilities of a corrections officer to answer that question in the affirmative. Raspa countered that the job description specifically contains the caveat that:

Note: The examples of work for this title are for illustrative purposes only. A particular position using this title may not perform all duties listed in this job specification. Conversely, all duties performed on the job may not be listed.

Moreover, at trial, Raspa proffered evidence that positions existed within the county jail that did not require inmate contact; that he had served in such positions for three years without complaint; that at least one other corrections officer filled such a position on a permanent basis; that a corrections officer was not to leave those

posts even in an emergency; and that, in any event, a corrections officer could perform other functions of the job listed in the NJDOP job specifications, such as observing inmates, if serving exclusively within those positions. Based on the record, there was evidence to support the jury's conclusion that inmate contact was not an essential part of the job of a corrections officer.

That finding gave rise to the further issue of whether a reasonable accommodation for Raspa could take place without creating an "undue burden" for the Sheriff's Office. The Sheriff's Office argued that such an accommodation would be unduly burdensome because the "four" light duty positions within the institution had to be available for temporarily injured officers. According to the record, those positions were in the main control room which requires two or three officers per shift and in the second, third, and visitors' control rooms, each of which requires at least one officer per shift. In the institutional setting, there are three daily shifts, thus requiring fifteen to eighteen officers on "light duty" over the course of a day. Moreover, the record reveals that the Sheriff's Office was able to assign injured corrections officers to positions outside of the facility, including posts in the records room, the communications department, and the county animal shelter. Thus, the Sheriff's argument that he would have had to "create" the "new" permanent light duty assignment for Raspa was simply unavailing. Against that backdrop, the jury could easily have found that the Sheriff's Office, having never even discussed an accommodation with Raspa, failed to fulfill its duty to consider a reasonable accommodation for him.

For those reasons, I would affirm the judgment of the Appellate Division and permit the jury verdict to stand.

Chief Justice ZAZZALI joins in this opinion.

*For reversal and remandment*—Justices LaVECCHIA, ALBIN, RIVERA–SOTO and HOENS—4.

*For affirmance*—Chief Justice ZAZZALI, and Justice LONG—2.