**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1834-23

PETER LAPOSTA,

    Plaintiff-Appellant,

v.

JOHN F. KENNEDY
MEDICAL CENTER and
HACKENSACK MERIDIAN
HEALTH, INC.,

    Defendants-Respondents.

_____

Argued February 12, 2025 – Decided June 2, 2025

Before Judges Currier and Torregrossa-O'Connor.

On appeal from the Superior Court of New Jersey, Law Division, Middlesex County, Docket No. L-0913-21.

R. Daniel Bause argued the cause for appellant (O'Connor, Parsons, Lane & Noble, LLC, attorneys; Gregory B. Noble and R. Daniel Bause, on the briefs).

Raquel S. Lord argued the cause for respondents (Greenberg Traurig, LLP, attorneys; Kristine J. Feher, of counsel and on the brief; Raquel S. Lord and Scott Humphreys, on the brief).

PER CURIAM

Plaintiff, disabled and formerly employed part-time by defendants, John F. Kennedy Medical Center (JFK or hospital) and Hackensack Meridian Health, Inc. (HMH) (collectively defendants),[1] appeals from a February 2, 2024 Law Division order granting summary judgment and dismissing plaintiff's complaint alleging defendants terminated him in violation of the Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -50. Having carefully reviewed the record in the light most favorable to plaintiff under applicable law, we conclude the trial court properly granted summary judgment dismissing plaintiff's claims, as the LAD imposed no obligation on defendants to afford plaintiff a permanent light duty assignment because plaintiff could not perform the essential functions of his position as a hospital food service worker, even with reasonable accommodations. We affirm.

I.

A.

Diagnosed with Cerebral Palsy, plaintiff experienced symptoms from a young age, including "difficulty with motor skills[,] . . . speaking[,] and various other physical ailments." At age twenty-two, he enrolled in a vocational

---

[1] JFK merged with HMH in 2018.

program that facilitated his placement in a part-time employment position in the food services department, which he held for thirty years, until his termination in October 2020.

It is undisputed that over his roughly three decades of employment, plaintiff never performed numerous essential functions required of a food service worker at the hospital. These "[e]ssential [g]eneric [j]ob [f]unctions" were set in a written "[HMH] Job Description," prepared by Heather Duffy, director of the dietary department, and listed "in order of importance" as follows:

> 1.  Completes temperature logs and eye wash logs. Operates dish machine properly cleaning and sanitizing patient trays, plates, utensils, etc. Washes and sanitizes pots and pans properly in three compartment sink. Performs general cleaning and sanitizing functions: mops floors, cleans equipment, disposes of trash, etc.
>
> 2.  Collects trays after patients have eaten on assigned units being mindful of courtesy, and patient privacy. Checks with the patient before taking the tray. Follows infection control procedures in patient areas; handwashing; glove use; isolation precautions. Delivers patient trays as assigned using proper identification procedures. Delivers food trucks to hosts in a timely manner.
>
> 3.  Serves food to customers/patients in the cafeteria, catering or on tray line. Practices safe food handling: washing hands and work surfaces; holding food at appropriate temperatures. Presents themselves to customers and patients in a clean, professional manner according to dress code.

3

4. Stores receivables in proper locations. Avoids exposing potentially hazardous foods to ambient temperatures. Restocks supplies in the kitchen and cafeteria: juice, milk, coffee, paper supplies, etc.

5. Other duties and/or projects as assigned.

6. Adheres to HMH Organizational competencies and standards of behavior.

Plaintiff conceded that, from the beginning, he was only responsible for "wiping down tables" and "taking the garbage from the garbage bins to the compactor" roughly five times a day. Plaintiff indicated he "[s]ometimes" operated the dishwasher and stocked the kitchen with cups, napkins, and linens, but never went to patients' rooms, nor "wash[ed]" or "sanitize[d]" the kitchen "pots and pans." Plaintiff explained his direct supervisor, Steven Mandela, assisted him with certain tasks such as garbage collection and cleaning tables.

According to Duffy, plaintiff could not perform "[m]ost of his full job dut[ies]," and the hospital "accommodated whatever [plaintiff] could do." From the outset of his employment, plaintiff's duties were limited and required supervision, and his performance of those duties drew complaints from customers. Plaintiff's disability impacted his hygiene and dexterity, rendering him unable to perform many official food service tasks safely and sanitarily.

A-1834-23

Plaintiff's performance evaluation from 1994-1995 indicated plaintiff's job entailed "maintaining cafeteria tables (cleanliness and arrangement) [and] [k]eeping [the] floor area by the condiments [clean] and assisting the dishroom with removing garbage from the dishroom." The hospital "elected to train [plaintiff] in these specific tasks only," and, "[a]lthough the tasks [were] limited, they [were to] be performed consistently and [plaintiff] require[d] continued supervision and reinforcement or the tasks [would] not [be] performed according to directions." The report reflected complaints by patrons about plaintiff's "unpleasant personal hygiene," and noted that plaintiff was advised he "need[ed] to change and w[ould] be counselled on this."

Although plaintiff's mother singularly maintained that plaintiff performed his job "[v]ery well," numerous hospital employees who worked with plaintiff provided their accounts of plaintiff's adverse performance history. Plaintiff admitted and Duffy recounted that plaintiff's condition caused him to "drool[] excessively." Duffy indicated that plaintiff "spit[] when he talk[ed]," and a 2018 email from Jean Landen, Human Resources Operations Manager, indicated plaintiff had been "drooling more than usual and accidentally spitting on people," and he was asked to "be more careful."

A-1834-23

Duffy explained the COVID-19 pandemic caused a "heightened awareness throughout the hospital . . . [and] around sanitation and spreading COVID," leading to the imposition of mandatory specific COVID-19 infection control precautions and personal hygiene requirements. Among those protections, the hospital "assigned people to clean [and sanitize] the tables . . . between uses." Duffy recalled that in the spring of 2020, "[plaintiff] could[ not] adequately clean the tables, so he pretty much was . . . just taking out the trash at that point," and she "struggl[ed] to find work to keep him busy," as he was unable to perform other tasks such as "wash[ing] the garbage containers, . . . [as] he could[ not] turn the handles on and off the spigots to do that, or really operate the nozzle." Plaintiff's supervisors expressed "concern[]" with [plaintiff's] ability to wash his hands" due to his hand "contractures."

Colleen Kearney, Vice President of Operations, eventually directed Duffy to remove plaintiff from cleaning tables because he could no longer "open" or "grip [the wipes] to actually wipe the ta[bles]." Plaintiff acknowledged Duffy and Mandela advised him he was not wiping the tables properly, that patrons complained, and that this created a "sanitation concern." Eventually, the hospital further reduced plaintiff's role to discarding cafeteria garbage. Plaintiff admitted he had "difficulty lifting the big trash bags out of the bins" because

6

they were too heavy, so Mandela instructed him to stop "lifting big trash bags" when they "became too heavy."

Kearney expressed specific concern that plaintiff could not meet the hospital's COVID-19 mask requirements applicable to every employee, mandated for "infection control [and] sanitation." Plaintiff's uncontrollable drooling caused his mask to become "saturated" with saliva within minutes, preventing its proper function. Christopher Voorman, the hospital's head chef, testified he saw plaintiff without his mask worn "appropriately" "[d]ozens of times," indicating it happened "daily."

Apprehension regarding plaintiff's hygiene increased on May 26, 2020, when Duffy observed plaintiff wearing an exposed undershirt "covered in excrement in the back [at] approximately belt level." Duffy formally documented the incident in a "Fitness for Duty" written report, citing the hospital's "general appearance guideline[s]" for all "team members." The guidelines mandated "[p]ersonal cleanliness and hygiene . . . at all times" and required that "clothing . . . be suitable for providing guest/patient care and conducting [HMH] business," and be "clean[ed], pressed, and in good condition."

Voorman recalled confirming Duffy's observations and asking plaintiff if he realized his shirt was soiled and plaintiff asked Voorman not to report this to anyone, especially Duffy. Plaintiff confirmed the incident and that he asked Voorman not to tell anyone "[b]ecause [he] did[ not] want to get in trouble." Plaintiff agreed this created a "sanitation concern" and could cause illness if the excrement spread to a food tray.

The report further described "objective indications and/or behaviors that [plaintiff was] physically and/or mentally unable to perform the essential functions" of his position, describing the essential functions of a food service worker. The form noted plaintiff "has limited communication skills and physical abilities," and although he had "thus far been accommodated[,] . . . [he] require[d] frequent direction and reminders to stay on task. There [we]re very few tasks he c[ould] perform autonomously." Moreover, Duffy noted plaintiff's issues, including his hygiene, necessitated "keep[ing] him away from food areas," indicating he could no longer "clean the tables . . . [or] wash his hands to standard." He also could not push trash bins without "nearly hitting people."

The report summarized:

> He cannot perform the other tasks of the Food Service Worker, especially within a timely manner. He has limited ability to use his hands. He cannot grip an object well. He cannot open containers or wring mops.

A-1834-23

He has an unsteady gait/poor balance. He has limited ability to lift/push. He is walking around the department idle (not performing work).

Duffy also included that plaintiff "pose[d] a threat to self or others" and described the threat as "[r]isk to him getting hurt. Risk/health code violation (excrement on clothing)—food borne illness."

Duffy referred plaintiff's matter to HMH physician Sonia Chatterjee, M.D., who advised that plaintiff should remain out of work "if he was unable to maintain adequate hygiene standards." Dr. Chatterjee assessed plaintiff's physical abilities to perform his job, and plaintiff was referred "to his personal MD/neurologist regarding functional capacity and accommodations." Dr. Chatterjee recommended plaintiff's work status be designated "No Work Capacity," effective June 2, 2020, and plaintiff was "[a]dvised to bring clearance letters from personal physicians."

Plaintiff subsequently produced a letter dated June 19, 2020 from Michelle Wilks, M.D., who worked for HMH, stating, "[a]fter examining [plaintiff,] I do not see any reason to preclude him from working in his current position in the dietary department. If you have any questions[,] please call me." The letter offered no further information. Dr. Chatterjee testified that she "did not know how [Dr. Wilkes] came to such a conclusion without conducting a

9

functional capacity evaluation," considering plaintiff had not treated with Dr. Wilkes "for two years."

Subsequently, the hospital engaged Kinematic Consultants to conduct an independent functional capacity examination of plaintiff. The evaluation in July 2020 concluded, "Based on [plaintiff]'s movement, strength, and balance, he demonstrates ability for [l]ight category work (occasional lift and work up to [twenty pounds]) with the above noted job movement demand changes." It recommended his "assisting with light maintenance of work areas (i.e. wiping surfaces), retrieving food carts with finished trays, assisting with loading/unloading light supplies" not exceeding twenty pounds. Referencing plaintiff's "gait," it was "recommended" he avoid "prolonged or repetitive unassisted standing/walking [over thirty to forty-five] minutes," noting also that "movement and balance" concerns merited "caution when walking on slippery/uneven surfaces."

Further, the evaluation noted plaintiff's "demonstrated wrist movement and dexterity" reflected that "fine motor activities are not recommended at this time (i.e. small parts assembly, activities requiring repetitive opening/closing of hands/individual fingers)." His "neuromuscular condition" favored movement such as pushing a cart to carrying individual garbage bags, concluding plaintiff

"demonstrates ability for any work up to [l]ight category with the recommended action modifications."

The hospital reviewed whether the proposed restrictions could be reasonably and safely accommodated. Hospital accommodation specialist Nancy Vanderham advised Duffy by email dated July 20, 2020 that plaintiff was "cleared to return to work with [the aforementioned] workplace restrictions," and plaintiff's "restrictions were permanent." Duffy and Landen regarded the evaluation as "only address[ing] [plaintiff's] physical abilities" and questioned whether the assessment accounted for the "infection prevention concerns," such as "washing hands, coming in clean, [and] correctly wearing a mask." Vanderham explained in an email to Landen and Dr. Chatterjee that "[t]he [evaluation] only addresse[d] [plaintiff's] physical abilities. The other issues should be addressed by his leadership and/or HR."

Camille Jadelis, the hospital's Team Member Relations Manager, testified that the hospital thus concluded plaintiff could not "successful[ly] . . . perform[] . . . tasks required of him in his job including not presenting himself [and] his hygiene in an acceptable manner which contributed to an overall poor job performance." The hospital terminated plaintiff on October 8, 2020.

11

The record revealed that, dating back to June 2015, plaintiff's supervisors documented incidents of plaintiff's additional infractions. Duffy prepared a written report describing an incident involving a hospital employee's reporting feeling "uncomfortable with the attention [plaintiff had been] giv[ing] her" while she was pregnant. Another incident report from 2015 indicated plaintiff called his co-worker a "c[***] sucker." A 2018 memorandum from a supervisor referenced that plaintiff "pushed [another employee] in the [c]afeteria," which Duffy considered grounds for termination in "a normal investigation." Plaintiff confirmed those incidents at his deposition and agreed that he "could have been terminated" for several of those prior "disciplinary incidents."

B.

After his discharge, plaintiff filed a complaint against defendants, alleging: (1) disability discrimination/perceived disability discrimination and failure to accommodate, in violation of the LAD; and (2) unlawful retaliation in violation of the LAD, N.J.S.A. 10:5-12(d), against all parties.

In August 2023, defendants moved for summary judgment and dismissal of the complaint, contending plaintiff could not meet his burden of establishing his disability discrimination claim as he could not demonstrate: (1) "that he was a qualified individual with a disability"; and (2) "that he was replaced by

someone outside his protected class."  Defendants asserted, despite plaintiff's working under the job title of "food service worker," "[w]hat he was actually doing was a special role essentially created just for him and . . . that was done by eliminating most of food service worker job duties."  Relying on Raspa v. Off. of the Sherif of Cnty. of Gloucester, 191 N.J. 323 (App. Div. 2007), and Muller v. Exxon Rsch. & Eng'g Co., 345 N.J. Super. 595 (App. Div. 2001), defendants argued the law does not entitle plaintiff to "always remain in that light duty role."  Defendants further asserted that "[t]here was no protected activity and there was certainly no causal connection" between plaintiff's disability and termination; thus, plaintiff's retaliation claim could not survive summary judgment.

Plaintiff argued "[t]he LAD requires that employers, especially large employers such as [HMH], reasonably accommodate individuals to allow them to remain in the workforce," and employing plaintiff was not "a favor."  He argued that "medical leave c[ould] . . . be a reasonable accommodation" if defendants determined that plaintiff's "disability prevented him from working due to the change of circumstances from [COVID-19]," and failure to accommodate or afford plaintiff leave violated the LAD.  Plaintiff theorized that his termination was a pretext as "[m]aybe [defendants] just got sick of carrying

[plaintiff] . . . or . . . reasonably accommodating" him; thus, defendants' motivation is a fact question that should be left to the jury to decide.

Defendants responded that the record lacked any support for the speculative claims of discriminatory pretext or retaliation, and "[t]he issue [here] was the direct threat to health and safety and the complete elimination of the essential functions of this job."

## II.

The court granted summary judgment, dismissing plaintiff's complaint in its entirety with prejudice. It determined that plaintiff's job title was "food service worker," but "he did[ not] really do that job"; and regardless, the hospital continued to employ plaintiff, trying to give him "anything he possibly could do," which "created a light[ ] duty position for him pretty much throughout his entire tenure." Reviewing the record, the court determined that defendants had no obligation under the law to continue to employ plaintiff in a permanent light duty role when he could not perform the job of food service worker even with reasonable accommodation. The court found Raspa and Muller "parallel[] this case," concluding "when an employer goes out of [its] way to do more than what the law requires, which is what happened in this case, for someone in a protected class, but then . . . stop[s] doing it, it can[ not] be held against [it]."

The court further found the record supported that the hospital could not continue to employ plaintiff for health reasons because it had legitimate concerns about plaintiff's hygiene, and defendants "bent over backwards" to accommodate plaintiff over the years. Noting the hospital's safety protocols, including the mask mandate, social distancing, and the use of hand sanitizer, the court determined there was no dispute that the hospital "could[ not] trust [plaintiff] on hygiene." The court found no evidence of discrimination and no facts upon which a jury could conclude that the hospital's termination of plaintiff due to health and safety concerns was a pretext.

## III.

Plaintiff raises the same arguments on appeal, contending the court erred by dismissing the complaint as there existed genuine issues of material fact regarding whether plaintiff met the prima facie elements of discrimination and retaliation claims and in finding defendants had no obligation to accommodate plaintiff's disability.

## IV.

"We review de novo the trial court's grant of summary judgment, applying the same standard as the trial court." Abboud v. Nat'l Union Fire Ins., 450 N.J. Super. 400, 406 (App. Div. 2017) (citing Templo Fuente De Vida Corp. v. Nat'l

A-1834-23

Union Fire Ins. Co. of Pittsburgh, 224 N.J. 189, 199 (2016)). This standard mandates summary judgment "if the pleadings, depositions, answers to interrogatories[,] and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." R. 4:46-2(c). "[C]ourt[s] must 'draw[] all legitimate inferences from the facts in favor of the non-moving party.'" Friedman v. Martinez, 242 N.J. 450, 472 (2020) (alteration in original) (quoting Globe Motor Co. v. Igdalev, 225 N.J. 469, 480 (2016)). "The court's function is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" Rios v. Meda Pharm., Inc., 247 N.J. 1, 13 (2021) (quoting Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995)).

Under the LAD, it is unlawful

> [f]or an employer, because of the race, creed, color, national origin, ancestry, age, marital status, civil union status, domestic partnership status, affectional or sexual orientation, genetic information, pregnancy or breastfeeding, sex, gender identity or expression, [or] disability . . . to refuse to hire or employ or to bar or discharge . . . from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment . . . .
>
> [N.J.S.A. 10:5-12(a).]

The LAD's provisions "should be given liberal construction in order that its beneficent purposes may be accomplished." Royster v. State Police, 227 N.J. 482, 500-01 (2017) (quoting Est. of Kotsovska ex rel. Kotsovska v. Liebman, 221 N.J. 568, 584 (2015)). Consequently, the court's task in considering summary judgment is not to determine the strength of the case, but rather to determine whether plaintiff's "allegations, if true, can establish that defendants violated the LAD." Beneduci v. Graham Curtin, P.A., 476 N.J. Super. 73, 82 (App. Div. 2023).

"To analyze employment discrimination claims brought under the LAD, New Jersey has adopted the 'procedural burden-shifting methodology' set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973)." Meade v. Twp. of Livingston, 249 N.J. 310, 328 (2021) (quoting Zive v. Stanley Roberts, Inc., 182 N.J. 436, 447 (2005)). "All employment discrimination claims require the plaintiff to bear the burden of proving the elements of a prima facie case." Victor v. State, 203 N.J. 383, 408 (2010). A prima facie case based upon discriminatory discharge requires that plaintiff demonstrate: "(1) that plaintiff is in a protected class; (2) that plaintiff was otherwise qualified and performing the essential functions of the job; (3) that plaintiff was terminated; and (4) that the employer thereafter sought similarly qualified individuals for

that job." Id. at 409 (citing Clowes v. Terminix Int'l, Inc., 109 N.J. 575, 596-97 (1988)).

When a plaintiff establishes a prima facie case, the burden shifts back to a defendant to rebut the presumption of discrimination by articulating "a legitimate, nondiscriminatory reason for the employer's action." Zive, 182 N.J. at 449 (citing Clowes, 109 N.J. at 596). If a defendant satisfies that burden, "the burden of production shifts back to the [plaintiff] to prove by a preponderance of the evidence that the reason articulated by [a defendant] was merely a pretext for discrimination and not the true reason for the employment decision." Ibid.

We first address plaintiff's contention that the court erred in concluding he failed to make a prima facie showing of "disability or perceived disability discrimination."

To establish a prima facie case for "disability or perceived disability discrimination" a plaintiff must demonstrate:

> (1) a disability or the employer's perception that the employee was disabled; (2) the employee remains qualified to perform the essential functions of the job and was performing at a level that met the employer's expectations; (3) an adverse employment action because of the disability or perceived disability; and (4) the employer thereafter sought a similarly qualified individual.

[Wild v. Carriage Funeral Holdings, Inc., 458 N.J. Super. 416, 429 (App. Div. 2019) (citing Grande v. St. Clare's Health Sys., 230 N.J. 1, 17-18 (2017)); Victor, 203 N.J. at 410-13.]

Plaintiff challenges as error the trial court's decision that plaintiff failed to establish that he was objectively qualified for his position.[2]

We have reviewed the record in the light most favorable to plaintiff and discern no dispute of material fact to sustain a claim that plaintiff "[wa]s qualified to perform the essential functions of the job, or was performing those essential functions, either with or without a reasonable accommodation," prior to his termination. Victor, 203 N.J. at 410. Plaintiff does not present any facts reflecting that he was qualified for the position for which he was hired—food service worker; nor could he, as, evaluated by an objective standard, see Viscik v. Fowler Equip. Co., 173 N.J. 1, 21 (2002), he never fulfilled that role, even with reasonable accommodation.

Instead, the record reflects defendants fashioned a substantially different light duty role for plaintiff that eliminated nearly all of the essential functions

---

[2] Plaintiff also challenges the fourth prong. There is no evidence to suggest that defendants replaced or filled the position after plaintiff's discharge; but we need not address this argument in light of our determination that plaintiff has not met the second prong.

of the position plaintiff held. "[C]onsistent with the LAD, an employer may reasonably limit light duty assignments to those employees whose disabilities are both temporary and not inconsistent with the duties of the light duty assignment . . . ." Raspa, 191 N.J. at 340-41. "[T]he availability of light duty assignments for temporarily disabled employees does not give rise to any additional obligation on the part of the employer to assign indefinitely a permanently disabled employee to an otherwise restricted light duty assignment." Id. at 341.

From its inception, plaintiff's job function entailed the very limited tasks of wiping tables and taking out the garbage. The record shows plaintiff's performance of even those few tasks required supervision and garnered complaints over the decades of his employment.

Plaintiff argues that "[p]rior to his termination, there appeared to be no discernible issues of the actual performance of such job duties." However, all witnesses to plaintiff's performance testified to the contrary regarding plaintiff's inability to perform basic tasks, including wiping the tables and taking out the garbage. Importantly, plaintiff also conceded he had difficulty performing required tasks, even admitting some issues raised serious "sanitation concerns."

He also acknowledged his pushing or cursing at co-workers could have resulted in his termination.

Although plaintiff's doctor, the Kinematic Consultants evaluation, and the hospital's subsequent accommodation recommendation indicated that plaintiff could perform modified light duty, those assessments did not address the serious health and safety concerns during and after the pandemic or constitute a legal determination as to defendants' legal obligations to continue plaintiff's employment. Significantly, the evaluation and subsequent accommodation recommendation both suggested that plaintiff's required restrictions were "permanent" and plaintiff "demonstrate[d] ability for [only] [l]ight category work," with additional modifications, providing no indication that his condition or any accommodation would be temporary.

Importantly, COVID-19 altered dramatically the hygienic protocols for hospital employees and food service facilities and services. This required that plaintiff maintain a mask and his own personal cleanliness and necessitated that he continuously sanitize tables and dispose of garbage with a level of strict compliance. Unfortunately, plaintiff's mobility and dexterity impairment, coupled with his excessive drooling and masking impediments, rendered him unable to adhere to sanitary requirements in a manner that ensured sufficient

health and safety. Consequently, he eventually became unable to perform even the exceptionally modified position he had once performed.

Nevertheless, we concur with the trial court's determination that the hospital was not required to continue to employ plaintiff as he was unable to perform, even with an accommodation, the fundamental requirements of the job. As the New Jersey Supreme Court clarified in Raspa,

> light duty positions were not intended to be a permanent post, but a temporary way station or bridge between an inability to work due to injury and a return to full employment status; they are intended as a shield to protect the temporarily disabled, and not as a sword by which a person who is otherwise unqualified for the position can demand a permanent posting.
>
> [191 N.J. at 340 (emphasis added).]

In Raspa, the plaintiff, a Gloucester County corrections officer who developed a "disabling disease" required an accommodation necessitating that he have "minimum to no contact with prison inmates to insure minimum risk [to the corrections officer.]" 191 N.J. at 327 (alteration in original). The defendant placed the plaintiff in "several temporary light duty assignments over a three-year period" and eventually "determined that it could not continue to extend light duty work to the permanently disabled corrections officer." Ibid. The Court held that "an employee must possess the bona fide occupational

22

qualifications for the job position that employee seeks to occupy in order to trigger an employer's obligation to reasonably accommodate the employee to the extent required by the LAD." Ibid. The Court further held that "[a]n employer may, consistent with the LAD, terminate the employment of an employee who, after consideration of available reasonable accommodations, nevertheless is no longer able to perform the essential functions of his job." Id. at 341.

We conclude that Raspa is controlling here. Plaintiff admitted that he was unable to perform the functions of a food service worker. There is no factual dispute over whether plaintiff was qualified to perform his job. See Muller, 345 N.J. Super. at 605 (upholding "the trial court's determination that [the] plaintiff was not an otherwise qualified individual, as he simply lacked the physical ability to perform his job"). Accordingly, defendants had no obligation to continue his employment.

For the same reasons, we next consider and reject plaintiff's claim that the record sufficiently supported his claims that defendants failed to reasonably accommodate his disability. Although plaintiff's termination is unfortunate given his years of employment, the record presented no dispute that plaintiff never performed the essential functions of his position, even with extraordinary modifications and accommodations.

To establish an LAD claim for failure to accommodate:

> a plaintiff must demonstrate that he or she (1) "qualifies as an individual with a disability, or [ ] is perceived as having a disability, as that has been defined by statute"; (2) "is qualified to perform the essential functions of the job, or was performing those essential functions, either with or without reasonable accommodations"; and (3) that defendant "failed to reasonably accommodate [his or her] disabilities."
>
> [Royster, 227 N.J. at 500 (alterations in original) (quoting Victor, 203 N.J. at 410).]

Reasonable accommodations include "[m]aking facilities . . . readily accessible"; restructuring jobs, such as providing "part-time or modified work schedules or leaves of absence"; the "[a]cquisition or modification of equipment or devices"; and "[j]ob reassignment[s]." N.J.A.C. 13:13-2.5(b)(1). Employers are to "consider the possibility of reasonable accommodation before firing, demoting or refusing to hire or promote a person with a disability on the grounds that his or her disability precludes job performance." N.J.A.C. 13:13-2.5(b)(2).

An employer is lawfully permitted, pursuant to N.J.A.C. 13:13-2.8(a), "to take any action otherwise prohibited . . . where it can reasonably be determined that an applicant or employee, as a result of the individual's disability, cannot perform the essential functions of the job even with reasonable accommodation."

24

We are satisfied that, viewing the record most favorably to plaintiff, a jury could not find that plaintiff ever performed the essential functions of the job with or without reasonable accommodation, and there was no indication that any accommodation would render him able to perform the tasks he had never before performed, even when given minimal light duty functions.

We likewise conclude the evidence does not raise sufficient facts to sustain plaintiff's claims that his termination was pretextual. Plaintiff claims that "this case presents a rare instance where the facts show that defendants' management, and . . . Duffy predominantly, blatantly targeted plaintiff for termination solely due to his disability and the fact that he required certain reasonable accommodations they no longer wanted to comply with."

We concur with the trial court's determination that the record demonstrates the opposite. Defendants employed plaintiff despite his deficits until it regarded his condition a threat to the safety of patients and patrons, particularly at the time of heightened pandemic health concerns. Any alleged animus by Duffy or others is conjecture that is not rooted in the record.

Finally, we consider plaintiff's retaliation claim. He argues "[he] was flagged by defendants for a fitness for duty examination," which kickstarted the process of reviewing plaintiff's ability to perform his job. Defendants maintain

the record demonstrates plaintiff was terminated solely "for [his] inability to safely perform his job duties (including, but not limited to, his undisputed hygiene issues)."  We agree and conclude plaintiff asserts no factual or legal basis to support his claim for retaliation under the LAD.

"The LAD declares that it is an unlawful employment practice 'to take reprisals against any person because that person has opposed any practices or acts forbidden under this Act.'"  Tartaglia v. UBS PaineWebber, Inc., 197 N.J. 81, 125 (2008) (quoting N.J.S.A. 10:5-12(d)).  To establish a prima facie case for a retaliation claim under the LAD, a plaintiff must "demonstrate that:  (1) [he or she] engaged in a protected activity known by the employer; (2) thereafter [his or her] employer unlawfully retaliated against them; and (3) [the] participation in the protected activity caused the retaliation."  Ibid. (quoting Craig v. Suburban Cablevision, Inc., 140 N.J. 623, 629-30 (1995)); see also Battaglia v. United Parcel Serv., Inc., 214 N.J. 518, 547 (2013).

Should a plaintiff sufficiently state "a prima facie case, the burden of production . . . shifts to [the] defendant to articulate a legitimate reason for that decision."  Woods-Pirozzi v. Nabisco Foods, 290 N.J. Super. 252, 274 (App. Div. 1996).  If so articulated, the "[p]laintiff must then show that a retaliatory intent, not the proffered reason, motivated [the] defendant's actions."  Ibid.

26                                                                    A-1834-23

The record does not contain evidence upon which a jury could find Duffy or hospital management retaliated against plaintiff in evaluating his continued employment after legitimate concerns arose about his performance and hygiene during the pandemic. No evidence, including plaintiff's testimony, supports speculation that Duffy and others merely "grew tired" of the hospital's three-decade effort to provide employment for plaintiff. To the contrary, as described, defendants treated plaintiff with dignity until they could no longer overlook certain disabilities that prevented his continued employment.

Affirmed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

M.C. Harley

Clerk of the Appellate Division

27